UNITED STATES of America, Appellant,

v.

Vance E. ROBINSON.

No. 74–1778.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1975.

Judgment filed Oct. 16, 1975.

Opinion filed Feb. 24, 1976.

Certiorari Denied March 8, 1976.

See 96 S.Ct. 432.

Carl S. Rauh, Principal Asst. U. S. Atty., Washington, D. C., for appellant. Earl J. Silbert, U. S. Atty., John A. Terry, James F. Rutherford, James F. McMullin and Jeffrey T. Demerath, Asst. U. S. Attys., Washington, D. C., were on the brief for appellant. Henry F. Greene, Executive Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellant.

Theodore J. Christensen, Washington, D. C. (appointed by this Court), for appellee Robinson.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

This is an appeal by the Government from a District Court order suppressing cer-

tain evidence—guns, money, clothing and other relevant items—seized by the police during a warrantless search of a parked and unoccupied car, allegedly used by appellee Robinson as the getaway car following an armed bank robbery. On June 30, 1975, a division of this court affirmed the District Court's order. This court granted the Government's petition for a rehearing en banc, and heard oral argument en banc on October 14, 1975. On October 16, 1975, an en banc order of reversal was entered, ordering that the items seized from the car be allowed into evidence if otherwise admissible. We stated that an opinion would issue in due course. We begin with a statement of facts that draws heavily on the careful statement in the panel opinion.

## I.

On the 21st of March, 1974, at about 11:15 a. m., a branch of the American Security & Trust Company, a federally insured institution located at 822 East Capitol Street, N.E., Washington, D. C., was robbed by four black males. Moments later a witness, Ms. Eleanor Leary, who was in the process of parking her car near the intersection of 8th and A Streets, observed four black men trotting north on 8th Street in her direction. Two of them got into a two-toned tan luxury automobile (later identified as a Cadillac Eldorado) and departed from the scene; one crossed the street and fled in a second vehicle; and the fourth continued his flight on foot. Alerted by the siren from a passing police car, Ms. Leary approached two policemen who had arrived on the scene and told them what she had seen. The police in turn relayed her information to the police communications office via their squad car radio. The officers next escorted Ms. Leary to the bank premises where she talked with several investigating detectives and then took her home.

At approximately 11:25 a. m., Officers Schlueter and Perkins, who were on routine patrol at the intersection of 6th and K Streets, N. E., received a flash message over their squad car radio directing them to be on the lookout for a "tan luxury auto occupied by two Negro males, last seen heading north on 8th Street, N.E." The officers were told that the car was wanted in connection with a possible bank robbery. Almost simultaneously, the officers saw Robinson's tan Eldorado Cadillac pass in the opposite lane heading north. The officers turned their marked squad car around and followed the Eldorado to 7th and Orleans Streets where it pulled over to the left curb of the street and came to a halt. It was raining very hard that day and the two suspects remained in the Eldorado for a few moments before alighting. Robinson, the driver, got out, looked over at the officers, smiled at them and then reached into the back seat to get a coat which he put on. Robinson and the passenger, who had no coat, then began walking south toward Morton Place, N.E., where they met a third person. Robinson and this third person walked into a house at 1111 7th Street, while the passenger continued walking down Morton Place.

After the two suspects had departed, Officers Schlueter and Perkins drove around the block and came up behind the Eldorado where they noticed a cable wire hanging from the trunk, which they took to be indicative of the trunk having been closed in a hurry, so they decided to take a closer look. When they looked through a window of the Eldorado, they saw a bundle of clothing with a blue coat on top beneath the passenger seat. At some point they tried to open the doors of the Eldorado but found that they were locked. Thinking it odd that the passenger had walked out into a heavy rain without putting on a coat, they called for assistance, and parked in a nearby alley where they could keep the car in sight.

Within fifteen minutes, a Detective Fontana and several others arrived at the location of the vehicle. Detective Fontana testified that when he arrived there were "about ten" police officers in the vicinity of the car. (Tr. 14). Meanwhile, a Detective Kaclik and an F.B.I. agent picked up Ms. Leary at her home and drove her to Orleans Place where she positively identified the Eldorado as one she had seen earlier. This

identification was made approximately forty-five to fifty-five minutes after the robbery. (*Compare* Tr. 18 *with* Tr. 107). Officer Fontana then called a Mobile Crime Lab for assistance in opening the vehicle, and processing the search in it, being particularly interested in avoiding the complication of an unspecialized officer contributing his own prints (Tr. 21–22). After the arrival of the Mobile Crime Lab, Detective Fontana enlisted instead the aid of a young passerby and paid him a dollar to reach through a partially open window of the car and lift the lock. The car was unlocked fifteen minutes after Ms. Leary's positive identification (Tr. 22). Officer Alford of the Mobile Crime Lab conducted a search of the passenger section and found that the blue coat under the front seat, previously observed through the window, was wrapped around money and a revolver. The car was then taken to the Fifth District headquarters where the police opened the trunk and found a carbine, money and a large purse-type bag similar to one carried by the bank robbers. During his search of the car, Officer Alford discovered a registered letter bearing Robinson's name and a nearby address. Police officers went immediately to this address but found the apartment empty.

In an eight count indictment filed May 2, 1974, Robinson and a co-defendant were charged with armed bank robbery, bank robbery, armed robbery, robbery, assault with a dangerous weapon, and Robinson was additionally charged with two counts of carrying a dangerous weapon. Subsequently, on May 17, 1974, Robinson filed a motion to suppress the fruits of the automobile search. His co-defendant, Michael J. Bradshaw, is not involved in the present appeal.

## II.

Upon the facts just recounted both the District Court and the panel came to the conclusion that, although there was proba-

ble cause to search the automobile, there was insufficient exigency to justify the failure to obtain a warrant. Treating exigency as "basically . . . a factual question," the panel decided that the District Court's ruling was not "clearly erroneous." But the facts here are not in dispute; there is no question of credibility of witnesses, and the issue is a legal one of constitutional dimension, whether these facts present a situation that the law considers "exigent" so as to dispense with the warrant requirement.[1]

The burden is on the Government to support the legality of a warrantless search. " '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). Furthermore "[t]he exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' " 403 U.S. at 455, 91 S.Ct. at 2032.[2] The term "exigent" has become the legal designation for a set of emergency law enforcement situations excepted from the warrant requirement. These situations, in turn, are generally analyzed in terms of the various component circumstances which contribute to the need for immediate action.

## III.

The Government begins with reference to the long-established "automobile exception" to the warrant requirement where exigency is premised on mobility. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Appellee argues that application of *Carroll* and its progeny to this case would make the automobile "exception" the rule, and turn

1. *Compare United States v. Collins,* 142 U.S. App.D.C. 100, 104 n.11, 439 F.2d 610, 614 n.11 (1971) (determination of probable cause).

2. Quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

the word "automobile" into the "talisman" it is not supposed to be. *See Coolidge v. New Hampshire,* 403 U.S. 443, 461–62, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Government admits that the mere fact that an automobile is involved does not dispense with the warrant, but insists it remains a significant factor.

■ The very term "exigency" commands that analysis be shaped by the realities of the situation presented by the record. Here we are faced with the warrantless search of an unoccupied, parked and locked car. When they parked and left the car, the defendants, in effect, were voluntarily relinquishing their vehicle's mobility, at least for the present. The police then proceeded to eliminate any realistic possibility of mobility by surrounding the car with a substantial number of officers. On its face, then, this is a case where mobility of the car posed a potential rather than a present exigency.[3]

The Government responds that once it is conceded, as the panel did concede, that the potential of mobility made it reasonable to immobilize the car (an act amounting to a de facto seizure of it), and to continue the immobilization until a warrant was obtained, then under *Chambers* an immediate search was also proper.[4] Defendants contend that the *Chambers* equivalence of immobilization and search is applicable only to the *Chambers* fact situation, of a car stopped while moving on the highway, where the stoppage of movement itself constitutes a substantial intrusion, and is not applicable to a parked and unoccupied car, where all that is needed is a non-intrusive overwatch.[5]

The application of the *Carroll* doctrine, as characterized in *Chambers,* to unoccupied, parked cars[6] has been particularly troublesome for the Supreme Court. The plurality in *Coolidge* struck down the search of an unoccupied car parked on private property, and appeared to restrict *Chambers* to searches preceded by a valid *Carroll* stop, *i. e.,* to vehicles stopped while moving on the open highway.[7] Another plurality opinion,

---

**3.** The plurality in *Coolidge* rejected speculative, far-fetched exigencies based on potential mobility:

> In this case, it is, of course, true that even though Coolidge was in jail, his wife was miles away in the company of two plainclothesmen, and the Coolidge property was under the guard of two other officers, the automobile was in a literal sense "mobile." A person who had the keys and could slip by the guard could drive it away. We attach no constitutional significance to this sort of mobility.

403 U.S. at 461 n.18, 91 S.Ct. at 2035.

Mobility potential, however, can spawn an exigent situation if the police have insufficient manpower to post a guard as an assurance of continued immobilization. *See United States v. Free,* 141 U.S.App.D.C. 198, 202, 437 F.2d 631, 635 (1970). However, here the record reveals a surfeit, not a shortage, of police officers involved in the investigation.

**4.** *Chambers, supra,* 399 U.S. at 52, 90 S.Ct. at 1981:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to

search, either course is reasonable under the Fourth Amendment.

**5.** *See generally* Note, *Warrantless Searches and Seizures of Automobiles,* 87 Harv.L.Rev. 835, 845 (1974). The greater-lesser intrusion analysis used in *Chambers* to justify the equivalence of immobilization and immediate warrantless search has been used by some courts as a basis for allowing warrantless searches of other items deemed to have mobility characteristics. *See, e. g., United States v. Hand,* 516 F.2d 472 (5th Cir. 1975) (en banc). Such extensions of the concept should be undertaken with care to assure that in each case the stoppage of movement is in fact an intrusion of magnitude equal to an immediate warrantless search. *See generally* Note, *Mobility Reconsidered: Extending the Carroll Doctrine to Movable Items,* 58 Iowa L.Rev. 1134 (1973).

**6.** This court in 1952, relying on *Carroll,* with only cursory attention paid to the issue, upheld the search of an unoccupied, parked car. *United States v. Cefaratti,* 91 U.S.App.D.C. 297, 202 F.2d 13 (1952), *cert. denied,* 345 U.S. 907, 73 S.Ct. 646, 97 L.Ed. 1343 (1953). *Cefaratti,* however, being pre-*Chambers, Coolidge* and *Cardwell,* is not controlling here.

**7.** *Coolidge, supra,* 403 U.S. at 463 & n.20, 90 S.Ct. at 2036 (emphasis in original):

however, relied directly on *Chambers* to uphold the warrantless seizure of an unoccupied car parked in a public parking lot, and refused to attach any significance to the lack of a prior *Carroll* stop. *See Cardwell v. Lewis,* 417 U.S. 583, 594, 94 S.Ct. 2464, 2471, 41 L.Ed.2d 325 (1974):

> The fact that the car in *Chambers* was seized after being stopped on a highway, whereas Lewis' car was seized from a public parking lot, has little, if any, legal significance.

*Chambers, supra,* is of no help to the State, since that case held only that, where the police may stop and search an automobile under *Carroll,* they may also seize it and search it later at the police station.[20]

[20] Part III–B of the concurring and dissenting opinion of Mr. Justice Black argues with vehemence that this case must somehow be controlled by *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, yet the precise applicability of *Chambers* is never made clear. On its face, *Chambers* purports to deal *only* with situations in which the police may legitimately make a warrantless search under *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. Since the *Carroll* rule does not apply in the circumstances of this case, the police could not have searched the car without a warrant when they arrested Coolidge. Thus Mr. Justice Black's argument must be that *Chambers* somehow operated *sub silentio* to extend the basic doctrine of *Carroll.* It is true that the actual search of the automobile in *Chambers* was made at the police station many hours after the car had been stopped on the highway, when the car was no longer movable, any "exigent circumstances" had passed, and, for all the record shows, there was a magistrate easily available. Nonetheless, the analogy to this case is misleading. The rationale of *Chambers* is that *given* a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station. Here, we deal with the prior question of *whether* the initial intrusion is justified. For this purpose, it seems abundantly clear that there is a significant constitutional difference between stopping, seizing, and searching a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose. That the police may have been legally on the property in order to arrest Coolidge is, of course, immaterial, since, as shown in II–A of the text, *supra,* that purpose could not authorize search of the car even under *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

This plurality opinion stated that *Coolidge* was distinguishable from *Chambers* because *Coolidge* involved entry on private property (a driveway), whereas in *Chambers* "the automobile was seized from a public place where access was not meaningfully restricted." 417 U.S. at 593, 94 S.Ct. at 2471.[8]

Our acceptance of an independent justifying exigency put forth by the Government makes it unnecessary to attempt to synthesize and reconcile these divergent plurality opinions,[9] and it is to that other exigency we now turn.

8. The *Cardwell* plurality also claims that this was the ground on which *Coolidge* plurality distinguished *Chambers,* a statement hard to reconcile with footnote 20 of *Coolidge* read in full, *see* note 7 *supra.* We take note that all of the Justices comprising the *Coolidge* plurality dissented in *Cardwell.* The emphasis in footnote 20 seems to be on the initial *Carroll* stop in *Chambers,* contrasted with the fact that the car in *Coolidge* was parked and unoccupied. While the location of the car on private property is set forth as a fact in the case, *Coolidge* does not, at least overtly, identify this as a fact of crucial legal importance.

9. The Supreme Court's recent *per curiam* in *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209, 44 U.S.L.W. 3327 (1975) did not effect this needed reconciliation of *Coolidge* and *Cardwell.* *Texas v. White* reiterates and extends the ruling of *Chambers,* that if an immediate search at the scene is permissible, a later search at the stationhouse can be made without a warrant. Since the case involved a moving car that had been stopped, all the Justices began with the premise that an immediate search at the scene would have been permissible; their focus was on the validity of the stationhouse search. This is made clear by the majority's reference to the following language in *Chambers:*

> On the facts before us, the blue station wagon *could have been searched on the spot* when it was stopped since there was probable cause to search *and it was a fleeting target for the search.* The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured.

399 U.S. at 52, 90 S.Ct. at 1981 (emphasis supplied). Justices Marshall and Brennan were alone in contending that although "an immediate on-the-scene search . . . was clearly permissible," 423 U.S. at 70, 96 S.Ct. at 306, 44 U.S.L.W. at 3328, the subsequent search had to be independently justified.

## IV.

Although this case is not governed by the *Carroll* "automobile exception" for cars stopped on a highway, it does present a situation in which time was of the essence and it was "not practicable to secure a warrant." *Carroll,* 267 U.S. at 153, 45 S.Ct. at 285. There was need to proceed as quickly as possible to apprehend the robbers who had used this as the getaway car in an armed bank robbery consummated about an hour prior to the search. There was strong probable cause to believe this was the getaway car.[10] Bank robbers known to have been armed were at large, posing current dangers to the police and other citizens. An immediate search of the car could well produce the information needed to speedily apprehend the culprits. Delay to obtain a warrant would have impeded a promising police investigation and conceivably provided the added time needed by the bank robbers to avoid capture altogether. *Cf. Unit-*

ed States v. Ellis, 461 F.2d 962, 966 (2d Cir.), cert. denied, 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972). The case is within the spirit, though not the text, of the "hot pursuit" exception established in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

We therefore hold that this getaway car case entails exigent circumstances that justify a warrantless search of the car for clues as to identity or location of suspects. The pertinent factors are much like those set out by this court in *Dorman v. United States,* 140 U.S.App.D.C. 313, 319–21, 435 F.2d 385, 391–93 (en banc, 1970), as showing "urgent need" justifying a warrantless nighttime entry into a private home to effect an arrest. As in *Dorman,* we have a grave offense; a clear showing of probable cause; reasonable belief that the suspects are armed; a likelihood that the suspects will escape if not speedily apprehended, and peaceable entry. This case lacks the element of "strong reason to believe that the

In *Haefeli v. Chernoff,* 526 F.2d 1314, 44 U.S.L.W. 2302 (1st Cir. 1975), the court found a warrantless search of a car supported by exigent circumstances in light of the analysis in *Cardwell.* In a footnote the court remarked that the absence of discussion of exigent circumstances in *Texas v. White* gave further support to its conclusion. The intention of the *Haefeli* footnote is not clear. In any event, we see no indication in *Texas v. White* that there is never a need for a warrant in automobile search cases as long as probable cause for a search exists. We assume that if a Supreme Court majority intends to institute such a rule, and to depart from its prior approach, it will do so by express pronouncement to all concerned. In *United States v. Mitchell,* 525 F.2d 1275, 18 Cr.L.Rep. 2392 (5th Cir. 1976), the court invalidated a warrantless truck search, even though it was undisputed that there was probable cause to search the van for contraband (marijuana), because there were no exigent circumstances. The court, per Dyer, J., rejected the government's argument that a warrant was not necessary in the case of automobiles, ruled that it could not accept such a "radical expansion" of the theory of *Carroll* and *Chambers,* and held that "there is no per se exemption from the warrant requirement for automobiles." The issue in the present case is the validity of the initial on-the-scene search. Although counsel for appellee refers to the subsequent stationhouse search, notes that "[a]t no time be-

fore or during the search of the car did police obtain or attempt to obtain a warrant," and states that defendant's placing items in the trunk as well as the interior of the locked automobile was an assertion of privacy, Brief for Appellee at 6, 21, he does not argue as a separate contention that even if the search of the interior on the street was permissible the later stationhouse search of the trunk should be held invalid. *Chambers* and *Texas v. White* make it clear that if it is established that a warrantless search of the car on the street was permissible, there is no independent objection to the warrantless search of the car trunk at the stationhouse.

10. It was suspicious from the start that one of the car's occupants left a coat in the car and walked coatless into the rain. The general characteristics of the car matched the description of the getaway vehicle contained in the radioed "lookout." This warranted a "stop" on the car, and a call for a witness to identify the car. Once the witness from the scene of the bank robbery identified the automobile as the getaway car, and the coat in the car as being of the same color (blue) as a coat worn by one of the robbers, probable cause ripened to believe the vehicle was used in the robbery. The police could search the blue coat, along with other items in the car, to seek clues as to the whereabouts of the robbers.

suspect is in the premises being entered," [11] which was stressed in *Dorman* as justifying a warrantless entry into the suspect's home to make an arrest.[12] But in the case of a car on the street there is both lesser expectation of privacy than in a home (*see* note *13 infra*), and the entry into a car believed on strong probable cause to be the getaway car is justified, even though the suspect is plainly not now inside, in order to get clues that will aid location and apprehension of the suspect.

■ The lesser expectation of privacy for an automobile, as contrasted with a person or building interior,[13] is of particular significance to a getaway car whose very function is to use the public highway in the course of completing a crime. Mandatory licensing and registration and distinctive aspects of appearance and size in general combine to create a likelihood that a getaway car will be discovered early in a criminal investigation when the police are still "hot" on the trail. The getaway car may still contain fruits and instrumentalities of the crime, as was the case here, and in any event is likely to be a repository of clues as to the identity and location of the criminals. In sum, the prompt search of a getaway car may well be crucial in apprehending the criminals, recovering the fruits of the crime, and preventing other crimes.

Separately, none of these factors is conclusive, but taken together they identify exigent circumstances amply justifying the police in conducting an immediate warrantless search of the getaway car.

Our holding is supported by the rulings of the Sixth Circuit in *United States v. Shye,* 473 F.2d 1061 (1973), and *United States v. Beck,* 511 F.2d 997, 1001, *cert. denied,* 423 U.S. 836, 96 S.Ct. 63, 46 L.Ed.2d 55 (1975). *Shye* also involved a warrantless search of a bank robbery getaway car. Judge McCree's opinion, joined by Judges Edwards and Cecil, eschewed reliance on the inherent mobility of the automobile, which was in a parking lot in back of an apartment house. Instead, the court premised exigency on "the existence of exceptional circumstances which because of the imperative of time excuse obtaining prior judicial approval . . . ." 473 F.2d at 1065. For the most part, the exceptional circumstances cited in *Shye* are the same as those relied on by this court: the search occurred soon after the robbery (two hours); the bank robbers had not been apprehended nor the money recovered; the robbers were armed; the police had strong probable cause to believe they had discovered the getaway car (as in this case, based on identification of the car by an eye-witness to the getaway); and immediate entrance into the car was required to continue a promising police investigation.[14]

**11.** 140 U.S.App.D.C. at 321, 435 F.2d at 393.

**12.** In *United States v. Brown,* 151 U.S.App.D.C. 365, 369, 467 F.2d 419, 423 (1972), this court held that an arrest warrant will support entry into the premises of a third person, not named in the warrant, if the officer has reasonable cause to believe that the suspect is present. A contrary view was stated in *England v. State,* 488 P.2d 1347 (Okl.Crim.1971). The divergence was noted in Justice Powell's concurring opinion in *United States v. Watson,* 423 U.S. 411, 433, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S.L.W. 4112, 4118–19 n.7 (1976), together with the comment that the Court there was not passing on the circumstances in which a home may be entered to make an arrest.

**13.** *See Cardwell, supra,* 417 U.S. at 590, 94 S.Ct. at 2469:
   "The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." *Almeida-Sanchez v. United States,* 413 U.S. 266, 279, 93 S.Ct. 2535, 2542, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.
   A similar thought was developed in *United States v. Free,* 141 U.S.App.D.C. 198, 202, 437 F.2d 631, 635 (1970).

**14.** In *Shye* the officers who first found the getaway car instituted a license plate check which revealed that the plates had been stolen. The record in the case at bar does not reveal the precise details (who, when, etc.) of the license plate check, but one had been run before the search was conducted (Tr. 23–4, 98). The check revealed that the car was registered

A quite different matter, addressed not to the police officers so much as to the Police Chief and the responsible legal officers in this jurisdiction, is the possibility in case of emergency of obtaining warrants based on sworn oral testimony communicated by telephone or other appropriate means, with procedures for recording, transcribing and certifying the statement. Development of such procedures would obviate the need to wrestle with the troubling question of when the police may rely on the indeterminate exception permitting warrantless search in case of exigency. This message was recently voiced by Judge McGowan, who noted that the language of neither the Fourth Amendment nor the Federal Rule of Criminal Procedure 41 is incompatible with obtaining search warrants upon oral affidavits transmitted by telephone.[15]

## V.

■ Defendant's claim that the investigative purposes of the police could have been equally well served by the less intrusive means of staking out the car until a warrant could be obtained, would have merit if we had premised exigency on mobility, see pp. 580–583, supra, but falters when applied to the exigency on which we do rely. The search here was conducted as a possible means of effecting the immediate resolution of an urgent situation. The police were expeditiously seeking the identity and whereabouts of dangerous criminals who were not in the car.[16] In Shye the Sixth Circuit rejected the contention that there was no urgency because the car was under guard and could not be moved. The court held Coolidge inapplicable because it was "imperative for the agents to know whether they were on the heels of the culprits." [17]

to defendant Robinson, and the search produced an envelope addressed to Robinson at an address different from that disclosed by the license plate check. This fact is noteworthy precisely because it could not have been specifically predicted; there is a high probability that search of a getaway car will produce some clues to be promptly pursued even though their exact nature cannot be foreseen.

15. *United States v. Johnson*, No. 73–2221, issued June 16, 1975 (panel dissent). Although the panel opinion and judgment were vacated when the case was set for rehearing en banc, the suggestion was not copyrighted. Judge McGowan's suggestions are more refined than the oral procedure projected in the panel dissenting opinion in *Dorman v. United States*, issued May 5, 1969. When *Dorman* was argued en banc, government counsel advised that the oral procedure possibility was not being pursued in view of new arrangements for magistrate availability. *See Dorman v. United States*, 140 U.S.App.D.C. 313, 323–24, 435 F.2d 385, 395–96 (en banc, 1970). But, as the court stated in *Dorman*—"Time may reveal weaknesses and point the way to supplements in the program." The time seems ripe for reconsideration of oral affidavits as a supplement to current procedures.

As Judge McGowan noted, there is pending a proposed amendment to Rule 41 of the Federal Rules of Criminal Procedure, already approved by the United States Judicial Conference, that would explicitly sanction such procedure. But there is no need for the local jurisdiction, con-

cerned with local crimes to await the completion of the Federal process underway.

Of course it would be for the local officials and courts to make the authoritative determination whether the procedure outlined above— that the oral statement be not only recorded but also transcribed and certified—satisfies the requirement of D.C. Code § 23–522(a), that applications be made in writing upon oath or affirmation to a judicial officer.

16. This stands in contrast to a situation in which the police reasonably believe an offender is in an apartment or hotel room, and can by modest resources keep guard on him while obtaining a warrant. That was the fact situation in the case that generated Justice Jackson's opinion on the need for a warrant and a magistrate's neutral and detached determination of the cause for search. *Johnson v. United States*, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *see also, e. g., United States v. Jeffers*, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951) (officers could have prevented removal of contraband "by merely guarding the door"); *Eng Fung Jem v. United States*, 281 F.2d 803, 805 (9th Cir. 1960).

17. 473 F.2d at 1064–65. Even if *Shye* had issued after *Cardwell*, the exigency approach of the *Shye* opinion would have made it unnecessary for the court to ponder whether under the rationale of the *Cardwell* plurality the location in *Shye*, a private parking lot, was governed by the rule for private driveways (*Coolidge*) or public parking lots (*Cardwell*).

The District Court relied on short periods of delay by the police in conducting this investigation to reach the conclusion that no exigent circumstances existed to justify the warrantless search. The failure of the two officers who first spotted the getaway car to interrogate the occupants when they left the car is one delay cited by the District Court to belie exigency. With all deference, there are good investigative reasons why police would await specific identification of the getaway car, establishing probable cause for the search, when that is possible within a reasonably short time.[18] In our view, the state of exigency continued after positive identification of the automobile as the getaway car.

The second period of delay—between Ms. Leary's positive identification and the search of the car—was only 15 minutes, and its purpose was to await the arrival of the mobile crime lab to maximize efficiency in handling clues.[19] In a situation both serious and urgent, the brief delay of the police was not one that negatived urgency but reflected a judgment that steps prudently taken at the outset would save time a half hour hence. The police conduct is to be commended for investigative alertness rather than picked at as negativing a sense of urgency.

The order of the District Court, directing the suppression of the evidence taken from the car, is reversed.

*So ordered.*

ROBB, Circuit Judge, with whom TAMM and WILKEY, Circuit Judges join (concurring):

Given the facts of this case I concur in Judge Leventhal's conclusion that the search was justified by the exigency of the situation. Since there was probable cause however I think *Texas v. White,* 423 U.S.

67, 96 S.Ct. 304, 46 L.Ed.2d 209, 44 U.S.L.W. 3327 (1975) would require us to sustain the search, even in the absence of exigency. As I read *Texas v. White* "the probable cause factor" would be decisive.

---

18. At the time the suspects alighted from the car, the officers had little evidence justifying an interrogation, and no knowledge of the details of the robbery necessary to make any such interrogation meaningful.

19. The fact that a small boy was enlisted to unlock the car is not material. It was impor-

tant to await the mobile crime lab in order to avoid the complication of added or overlayed prints by unspecialized officers (Tr. 21–22).