UNITED STATES of America

v.

Judy E. MARTIN, Appellant.

UNITED STATES of America

v.

Jerome K. JONES, Appellant.

Nos. 75–2092, 76–1224.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1976.

Decided April 4, 1977.

Rehearing Denied Sept. 14, 1977.

Gary Howard Simpson, Bethesda, Md. (appointed by this Court), for appellant in No. 76–1224 also argued for appellant in No. 75–2092.

Richard H. Saltsman, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty, John A. Terry and Roger M. Adelman, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Leroy Nesbitt, Washington, D.C. (appointed by this Court), was on the brief for appellant in No. 75–2092.

Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

BAZELON, Chief Judge:

Appellants were convicted by a jury of transporting, receiving, and possessing firearms in violation of various federal and District of Columbia statutes. They appeal, contending that certain evidence obtained through a warrantless search of a suitcase should have been suppressed. We agree that this evidence was improperly obtained, and we conclude that the district court's failure to exclude it requires that these convictions be reversed.

## I.

The relevant facts of this case are relatively simple and are not in dispute.

At approximately 10:00 a.m. on July 10, 1975, a special agent in the Cleveland, Ohio, office of the Bureau of Alcohol, Tobacco, and Firearms (ATF) received an anonymous tip that a machine gun had been shipped from Cleveland to Washington, D.C., where it was to be used in the planned escape of Terry Trice, an accused bank robber. The caller identified the gun's shipper as Judy Martin, and said that Martin had placed the disassembled weapon in a brown suitcase and had sent it to Washington via Greyhound Bus on July 7. The caller said that the gun would be picked up in Washington by a man named Jerry.

The agent called the Cleveland office of the FBI to seek information about Trice. He was informed that Trice was, indeed, being held in the Cleveland Jail, that he was wanted for bank robbery in Washington, and that he would shortly be transferred there. At approximately 2:00 p.m. the agent called the Washington area office of ATF to relay the information that he

had obtained from the anonymous caller and from the FBI.

Shortly after this call was received, two ATF agents went to the Greyhound Bus terminal in downtown Washington, arriving some time between 2:30 and 3:00 p.m. Accompanied by a Greyhound employee, the two agents entered the baggage area of the terminal and began searching for a suitcase fitting the description they had been given. One of the agents noticed that the baggage claim check attached to a brown suitcase bore the printed inscription "Cleveland;" thinking that this indicated that the suitcase had been shipped from Cleveland[1] the agent removed this suitcase from the baggage rack and placed it on a table.

The Greyhound employee noticed a bulge in the side of the suitcase; she felt the bulge, and said, "This is the nozzle [*sic*] of a gun." Both agents then felt the sides of the suitcase (which was made of a soft tweed fabric), and concluded that the bulge was caused by the barrel of a firearm; one of the agents, who had received instruction in firearms identification, concluded that this firearm was probably an automatic or semi-automatic rifle. The agents asked the terminal manager whether he could determine the suitcase's point of origin from the claim check number; the manager checked the number and informed the agents that the case had been shipped from Cleveland.

Some time thereafter,[2] the agents, who had by then been joined by two additional agents, forced the lock on the suitcase and opened it. Prior to opening the suitcase, the agents had made no attempt to obtain a search warrant. Between the time they examined the outside of the suitcase and the time they opened it, the agents had been in contact with their office and with an Assistant United States Attorney; they had not, however, sought any advice on the necessity of obtaining a warrant.

Inside the suitcase the agents observed an M-16 machine gun, broken down into two pieces, a snub-nose .38 caliber revolver, and some clothing. The agents closed the suitcase, without having removed any of these items, and returned the suitcase to its original location on the baggage rack.

The agents then donned Greyhound uniforms and assumed the roles of Greyhound personnel, so that they could maintain surveillance of the suitcase and the baggage area. At approximately 10:00 a.m. on the following morning, July 11, the agents observed Jerome Jones, accompanied by Tilman Powell, arrive at the baggage area, claim the suitcase in question, and leave the terminal. Both men were arrested shortly after leaving the terminal.[3]

Martin, Jones, and Powell were charged in an eighteen count indictment with violations of federal and District of Columbia firearms statutes.[4] Prior to trial the three

1. The reference to Cleveland indicated only that the tag had been *printed* in Cleveland; a suitcase's point of origin was indicated on the claim tag by a number code.

2. One agent testified at the suppression hearing that they opened the suitcase approximately fifteen minutes after completing their investigation of its exterior, tr. at 36; another agent testified that "an hour or a little more" had elapsed, tr. at 113.

3. Appellant Martin was arrested later that day. Four ATF agents, who had been told to watch for a U-Haul truck bearing Ohio license 9F-701, spotted the truck in Rockville, Maryland, and followed it to a parking lot in downtown Washington. Martin, who was a passenger in the truck, was arrested, and a loaded .22 caliber pistol was recovered from her coat pocket. A search warrant was thereafter obtained for the truck, and during the search the agents found

and seized a loaded .455 caliber Smith and Wesson pistol wrapped in a pillowcase.

4. Of the eighteen counts, the first ten charged appellant Martin, counts eleven through sixteen charged appellant Jones, and the last two charged Tilman L. Powell, who was acquitted. Specifically, the indictment charged appellant Martin as follows:

Count One —transportation of an M-16 machine gun in interstate commerce (18 U.S.C. § 922(a)(4), 924);

Count Two —transportation of an M-16 machine gun in interstate commerce which had not been properly registered (26 U.S.C. § 5861(j), 5871);

Count Three —transfer of an M-16 machine gun (26 U.S.C. § 5861(e), 5871);

Count Four —possession of an M-16 machine gun which had not been registered (26 U.S.C. § 5861(d), 5871);

defendants moved to suppress all evidence obtained as a result of the warrantless search of the suitcase. These motions were denied after a hearing. At trial, following the presentation of evidence, the court granted Powell's motion for a judgment of acquittal. Martin and Jones were each convicted on a number of counts.[5]

## II.

■ Although appellants argued below that the agents lacked probable cause at the time they opened the suitcase, they do not pursue this argument on appeal. Consequently, the only issue before us is whether the agents' failure to secure a search warrant renders the search improper and re-

quires that its fruits be suppressed.[6] The government contends that a warrant was not required here, because of the presence of certain "exigent circumstances."

It is "the most basic constitutional rule in this area" that warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–5, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). Those exceptions are "jealously and carefully drawn," and the burden is on the government to demonstrate that the "exigencies of the situation" made a warrantless search "imperative."

Count Five —transportation of an M-16 machine gun in interstate commerce after a felony conviction (18 U.S.C. § 922(g), 924);

Count Six —transportation of a .38 caliber revolver in interstate commerce after a felony conviction (18 U.S.C. § 922(g) 924);

Count Seven —transportation of a .22 magnum caliber Derringer pistol in interstate commerce after a felony conviction (18 U.S.C. § 922(g), 924);

Count Eight —transportation of a .455 caliber revolver in interstate commerce after a felony conviction (18 U.S.C. § 922(g), 924);

Count Nine —transportation of a .455 caliber revolver in interstate commerce knowing it to be stolen (18 U.S.C. § 922(i), 924); and

Count Ten —carrying a pistol without a license (22 D.C.Code § 3204).

Appellant Jones was charged as follows:

Count Eleven —receiving and possession of an M-16 machine gun which had not been transferred according to law (26 U.S.C. § 5861(b), 5871);

Count Twelve —possession of an M-16 machine gun which had not been registered (26 U.S.C. § 5861(d), 5871);

Count Thirteen —receipt of an M-16 machine gun which had been shipped in interstate commerce and had not been registered (26 U.S.C. § 5861(j), 5871);

Count Fourteen —receipt of an M-16 machine gun which had been shipped in interstate commerce after a felony conviction (18 U.S.C. § 922(h), 924);

Count Fifteen —receipt of a .38 caliber revolver which had been shipped in interstate commerce after a felony conviction (18 U.S.C. § 922(h), 924); and

Count Sixteen —carrying a pistol without a license (22 D.C.Code § 3204).

5. Appellant Martin was found guilty on counts one through eight and on count ten; appellant Jones was found guilty on counts eleven through sixteen. *See* n.4 *supra.* Martin was

sentenced to five years in prison on count one and ten years on each remaining count; Jones was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5010(c), to ten years on each count. For both appellants, the sentences on all counts were to run concurrently.

6. By the time the agents opened the suitcase, they certainly had probable cause to believe that it contained a machine gun—the suitcase fully matched the description provided by the anonymous caller, and the probing of the bag's exterior (both by the Greyhound employee and by the agents) provided corroboration that the weapon was, in fact, inside. However, while the issue has not been raised by appellants, we note that the "search" may have begun well before the agents opened the suitcase, when they began the careful probing of the bulge in the suitcase's side. See, *e. g., Hernandez v. United States,* 353 F.2d 624 (9th Cir. 1965), *cert. denied,* 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966) ("manipulation" of outside of a suitcase, including squeezing the sides of the suitcase together to force air—and the aroma of marijuana—to escape, constituted a search for purposes of the Fourth Amendment); *cf. Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). The questions of whether the exterior examination constituted a search, of whether probable cause existed at the time of that exterior examination, and of whether a warrant was required before that exterior examination was begun, would be close and difficult. However, given our disposition of this case, we need not reach those questions. The government does not dispute that *opening* the suitcase constituted a search; and appellants no longer dispute that probable cause existed when the suitcase was opened. Hence, the only issue we need address is whether a warrant was required before the suitcase was opened.

*Id.* The government must show, in other words, that the police were confronting an "emergency law enforcement situation," and that their "urgent need" to act as quickly as possible justified proceeding without a warrant.[7]

■ As this court has recently observed, "[t]he very term 'exigency' commands that analysis be shaped by the realities of the situation presented by the record."[8] And in the present case, the record simply does not reveal a situation of unusual urgency. On the contrary, the record makes clear that the agents here had ample opportunity to secure a warrant; and the "realities of the situation" were such that a warrant could have been obtained without imperiling either the safety of those involved, or the investigation itself. Four agents were present in the Greyhound terminal both before and after the suitcase was searched; one of those agents could clearly have gone to get a warrant, while the other three maintained the surveillance of the baggage area.

The government's arguments to the contrary are not persuasive. The government seeks first to rely upon our recent decision in *Robinson, supra,* where we upheld a warrantless search of a getaway car used in an armed bank robbery committed approximately one hour before the search. In *Robinson,* however, there was a reasonable likelihood that "[a]n immediate search of the car could well produce the information needed to speedily apprehend the culprits." 533 F.2d at 583. And delay in that case "would have impeded a promising police investigation and conceivably provided the added time needed by the bank robbers to avoid capture altogether." *Id.* Here, however, the agents could hardly have expected

to arrest Jones until he arrived to pick up the suitcase—and an immediate search of the suitcase could obviously have done nothing to expedite his arrival. Unlike the situation in *Robinson,* the successful conclusion of the agents' investigation here depended more upon the patient maintenance of the surveillance, than upon unusual haste or the prompt pursuit of whatever leads could be uncovered.[9] Indeed, after searching the suitcase, the agents continued to do precisely what they had been doing before—*viz.* maintain their surveillance of the baggage area—until Jones arrived, some nineteen hours later.

The government next argues that because the object searched—*i.e.,* a suitcase—was inherently mobile, this search may be justified by analogy to the so-called "automobile exception" to the warrant requirement. *See, e. g., Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The basis for that exception is the common-sense perception that in many cases it would not be "practicable" to require police officers to secure a warrant before searching a car, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll, supra,* at 153, 45 S.Ct. at 285. Some courts have held that the same logic would justify an exception to the warrant requirement for other movable items as well.[10]

■ The extent to which an object that the police wish to search is movable may well be relevant in determining whether sufficient "exigency" is present to justify an immediate, warrantless search. However, just as the word "automobile" is not

---

7. *United States v. Robinson,* 174 U.S.App.D.C. 351, 533 F.2d 578, 580, 582 (en banc), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976).

8. *Id.* at 581.

9. The agents testified at the suppression hearing that they decided to open the suitcase because of their concern for their own safety and the safety of others. Tr. at 79–80, 84–5, 122.

They did not suggest that they were looking for clues to aid in the more rapid solution of this crime, or the more rapid apprehension of the suspected criminals. And the search that they, in fact, conducted would have been unlikely to produce such evidence—the agents simply opened the suitcase, noted its contents, and closed it. Tr. at 39, 45.

10. *See* cases cited n. 12 *infra.*

"a talisman in whose presence the Fourth Amendment fades away," [11] the inherent mobility of the object to be searched cannot, without more, justify a failure to secure a warrant. The question in each case is not simply whether the item searched is movable; rather, the question is whether, in light of the "realities of the situation," there was a reasonable likelihood that the item *would be moved* before a warrant could be obtained. Where the possibility of movement is only remote or speculative, the police are simply not confronted with the kind of urgency which would excuse them from the warrant requirement. *See Coolidge, supra,* at 461, n. 18, 91 S.Ct. 2022.[12]

11. *Coolidge, supra,* at 461, 91 S.Ct. at 2035.

12. As we noted in *Robinson, supra,* the applicability of the "automobile exception" to unoccupied, parked cars—*i. e.,* to cars which are only *potentially* mobile—has been "particularly troublesome for the Supreme Court." 533 F.2d at 581. *Compare* the plurality opinions in *Coolidge, supra,* and in *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *see generally Robinson, supra,* at 581–2, nn. 6–9 and accompanying text.

The *Coolidge* plurality expressly held that mobility which was merely speculative or potential was of "no constitutional significance. . . ." 403 U.S. at 461, n. 18, 91 S.Ct. 2022. While the court in *Cardwell* did uphold the warrantless seizure and subsequent search of an unoccupied car parked in a public parking lot, there is nothing in the plurality opinion in that case to suggest that its authors were prepared to accept a *per se* rule excepting movable items from the Fourth Amendment's warrant requirement. Justice Blackmun, writing for the plurality, does cite the car's mobility as one factor justifying the warrantless search, *id.* at 590, 94 S.Ct. 2464; he appears to place primary reliance, however, upon the limited *scope* of the search which was conducted. He stresses that the search was restricted to an examination of one of the car's tires and to a taking of paint scrapings from the car's exterior, *id.* at 591, 94 S.Ct. 2464; he notes the more extensive *scope* of the search at issue in *Coolidge, id.* at 593, n. 9, 94 S.Ct. 2464 and accompanying text; and he concludes that this "warrantless examination of the *exterior* of a car is not unreasonable under the Fourth or Fourteenth Amendment." *Id.* at 592, 94 S.Ct. at 2470 (emphasis added). Thus, while *Cardwell* might provide strong support for the agents' warrantless examination of the *outside* of the suitcase, *see* n.6 *supra,* it would not support a *full* search of the *inside* of a suitcase, where the failure to obtain a warrant is premised on the suitcase's inherent mobility.

The lower court cases upon which the government relies and which have extended that "automobile exception" to searches of suitcases and other movable items, are readily distinguishable from the facts of this case. In *United States v. Johnson,* 467 F.2d 630 (2d Cir.), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973), the police were investigating a robbery in which a sawed-off shotgun had been employed. After the police had arrested the suspected robbers, they received a tip that the weapon could be found in a suitcase lying near the rear door of an apartment building. The police went to the building, found the suitcase, opened it, and discovered a loaded sawed-off shotgun. The Second Circuit held that the warrantless search and seizure of the suitcase did not violate the Fourth Amendment. The court pointed out that the suitcase was lying in the open in a "transient and high crime area. . . ." *Id.* at 639. The court noted that a guard *could* have been posted while a warrant was sought, but held that such a course was not required. The police in *Johnson* had no interest in keeping the suitcase under surveillance; the *only* justification for doing so would have been to allow time for a warrant to be obtained. In the present case, by contrast, the agents did not have to choose whether to post a guard or to conduct an immediate search—they had an independent justification for keeping the suitcase under surveillance, and the successful completion of their investigation *required* that the surveillance be maintained. Thus, delaying the search while a warrant was obtained would not even have caused the agents any particular inconvenience. As we noted in *Robinson, supra,* "[m]obility potential . . . *can* spawn an exigent situation if the police have insufficient manpower to post a guard as an assurance of continued immobilization," 533 F.2d at 581 n.3 (emphasis added). But since the agents *did* "post a guard," this is obviously not such a case.

Moreover, surveillance in the open, in a "transient and high crime area," would obviously have been riskier than the surveillance in the present case, which was conducted within the relatively secure—and relatively inaccessible—confines of the Greyhound Terminal baggage area. *See* discussion of the agents' safety concerns *infra.*

*See also United States v. Mehciz,* 437 F.2d 145 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971) (warrantless search of suitcases carried by suspect at time of his arrest upheld as incident to lawful arrest); *United States v. Giles,* 536 F.2d 136 (6th Cir. 1976) (warrantless search of suitcase upheld where delay to obtain warrant likely to result in losing the opportunity to apprehend a law violator); *United States v. Hand,* 516 F.2d

Here, with four agents guarding the terminal baggage area, there was obviously little likelihood that the suitcase could have been moved without the agents' being aware of it. While Jones might conceivably have slipped past both the Greyhound employees and the agents, located the suitcase, and removed it without arousing any notice, "[w]e attach no constitutional significance to this sort of mobility." *Id.*

In fact, as we have noted, *supra*, the agents here did not *want* to prevent Jones from moving the suitcase, since it was only by allowing him to claim and remove the suitcase that they could learn his identity, and arrest him. Consequently, as long as the agents were able to keep the baggage area under surveillance, it is hard to see why the suitcase's inherent mobility should have posed any sort of "exigency" at all.[13]

 Finally, the government argues that because the item being sought (*i. e.*, a machine gun) was dangerous contraband, no search warrant was required. This broad proposition is clearly insupportable. First, the distinction between contraband, instrumentalities, and fruits of crime on the one hand, and "mere evidence" on the other, is no longer relevant to Fourth Amendment determinations. *See Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).[14] And while a threat to the

472 (5th Cir. 1975) (*en banc*), *cert. denied,* 424 U.S. 953, 96 S.Ct. 1427, 47 L.Ed.2d 359 (1976) (warrantless search of handbag upheld where suspect had access to bag and had informed searching officer of her "immediate purpose" to remove the bag.) *Cf. United States v. Chadwick, 532 F.2d 773 (1st Cir. 1976), cert. granted,* 429 U.S. 814, 97 S.Ct. 54, 50 L.Ed.2d 74 (1976) (warrantless search of a footlocker which was "not in imminent or even potential danger of being destroyed or spirited away" held violative of the Fourth Amendment, even though the footlocker was located in the trunk of a car properly seized by the police and even though the search followed the arrest of the car's occupants); *United States v. Anderson,* 500 F.2d 1311 (5th Cir. 1974) (warrantless search of checked luggage impermissible, where police have effective control over the movement of that luggage). *See generally* Note, *Mobility Reconsidered: Extending the Carroll Doctrine to Movable Items,* 58 Iowa L.Rev. 1134 (1974).

13. In some circumstances, police immobilization of an automobile, suitcase, or other movable object, in order to allow time for a warrant to be obtained, may amount to a *de facto* seizure of that object; and where such a seizure is justified, a warrantless search may also be permissible. *See Chambers v. Maroney, supra,* 399 U.S. at 52, 90 S.Ct. 1975; *United States v. Hand, supra.* In each case, however, care must be taken to assure that "the stoppage of movement is in fact an intrusion of magnitude equal to an immediate warrantless search." *Robinson, supra,* at 581, n. 5.

It is questionable whether mere surveillance of the suitcase could be said to constitute a "stoppage of movement" at all. However, even if such a characterization were appropriate, it seems clear that such surveillance would constitute a *lesser* intrusion than a search of the suitcase's interior. *Compare United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25

L.Ed.2d 282 (1970). In *Van Leeuwen* packages shipped via first-class mail were detained for twenty-nine hours while a search warrant was obtained. The Supreme Court held that this detention of the packages was not "unreasonable" under the Fourth Amendment:

> The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained.

*Id.* at 253, 90 S.Ct. at 1032.

Thus, even actual interference with the delivery of the suitcase—and such interference was clearly unnecessary at the time of the search—would have been less intrusive than a search of the suitcase's interior, since it would have left undisturbed appellants' "significant Fourth Amendment" interest in the privacy of the suitcase's contents.

14. Even prior to the decision in *Warden v. Hayden, supra,* the contraband/"mere evidence" distinction had nothing to do with the warrant requirement. The rule set forth in *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) was that *only* contraband, instrumentalities, and fruits were subject to governmental search and seizure under the Fourth Amendment—"mere evidence" could not be searched for or seized at all, with or without a warrant. The warrant requirement was thus always held to apply to searches for contraband—indeed, under the pre-*Warden v. Haden* law, searches for contraband were the *only* types of searches to which this requirement could possibly apply.

The government's suggestion that this "contraband" could be seized without a warrant because it was "in plain view" is equally untenable. So far as we are aware, no court has held that something so evidently *not* "in plain view" as the inside of a locked suitcase could still be said to be "in plain view" for purposes

safety of police or bystanders may in some circumstances justify an immediate, warrantless search,[15] no such threat was present here. To be sure, the machine gun for which the agents were searching was an inherently dangerous object; but as long as the weapon was enclosed in a locked suitcase, located in the baggage area of a bus terminal, and as long as both the suitcase and the baggage area were under the surveillance of the agents, it is difficult to see how the weapon could pose any realistic threat to anyone. The agents themselves obviously shared this view—after conduct-

ing the search and confirming the presence of the weapon, the agents chose to leave the gun in the suitcase, and thus to allow it to come into Jones' possession.

### III.

■ We thus conclude that there were no "exigent circumstances" present here that justified the agents' failure to obtain a search warrant. The search was therefore improper, and its fruits should have been suppressed. The district court's failure to do so requires that these convictions be reversed.[16] The case is remanded to the

of the Fourth Amendment. However, leaving aside the troubling implications of this somewhat startling assertion, we note that there is an obvious inconsistency between the government's claim that the agents needed to open the suitcase so that they could confirm what was inside, and their claim that what was inside was already "in plain view." Finally, of course, this case does not meet the "inadvertence" requirement for the application of the "plain view" doctrine laid down in Justice Stewart's plurality opinion in *Coolidge, supra,* 403 U.S. at 461, 91 S.Ct. 2022 *et seq.* The discovery of the machine gun could hardly be said to be "inadvertent," since that was precisely what the agents were looking for when they went to the terminal, when they examined the outside of the suitcase, and when they opened the suitcase.

15. The government cites *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), in support of the proposition that warrants are not required when the police are searching for dangerous weapons. This is an obvious distortion of the meaning of those two cases. In both cases, the Supreme Court upheld limited warrantless searches of persons being interrogated by the police, when the police officers had a reasonable suspicion that those individuals might be armed and dangerous. The purpose of those searches was, obviously, self-protective—*i. e.,* to remove any weapons which might be found from the control of the individual being interrogated, before such weapons could be used. Here, of course, the police were searching an object, not a person, and their goal was not to remove a weapon from someone who might use it against them—indeed, having confirmed their suspicion that a weapon was present, the police then allowed that weapon to come into the possession of the only person likely to pose any threat to anyone.

16. Appellants have argued that there is an alternative justification for reversal in this case.

At trial appellants' counsel sought to use prior convictions to impeach various government witnesses. With respect to each of these witnesses, the trial judge permitted counsel to use only the witness' most recent conviction for impeachment purposes; all earlier convictions were excluded.

Appellants contend this limitation on their use of prior convictions to impeach government witnesses violated Rule 609(a) of the Federal Rules of Evidence. Because of our disposition of this case, we need not reach this issue. However, since this issue would almost certainly recur in any future trial of these appellants on the charges at issue here, some comment on the scope of Rule 609 would be appropriate.

In our view, the plain language of the Rule, and the interpretation of that language contained in the Congressional Conference Report significantly restrict a trial judge's discretion to exclude evidence of this sort. Rule 609(a) provides in pertinent part:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime *shall* be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment, in excess of one year . . . ., and the court determines that the probative value of admitting this evidence outweighs its prejudical effect *to the defendant.* . . . (emphasis added).

This language clearly suggests that the *only* justification for excluding evidence of prior felony convictions is a determination by the trial judge that the probative value of such evidence would be outweighed by its prejudicial effect to the defendant. This straightforward interpretation of the Rule's language is strongly supported by the Conference Report. The Report provides:

> With regard to the discretionary standard established by paragraph (1) of rule 609(a), the Conference determined that the prejudicial effect to be weighed against the proba-

district court so that it may determine on which counts of the indictment, if any, there is sufficient evidence remaining to support convictions of either or both appellants. As to those counts, new trials would be required; as to all other counts, the charges must be dismissed.

*So ordered.*

tive value of the conviction is specifically the prejudical effect *to the defendant* [emphasis in original]. The danger of prejudice to a witness other than the defendant (such as injury to the witness' reputation in his community) was considered and rejected by the Conference as an element to be weighed in determining admissibility. It was the judgment of the Conference that the danger of prejudice to a nondefendant witness is outweighed by the need for a trier of fact to have as much relevant evidence on the issue of credibility as possible. Such evidence should *only* be excluded where it presents a danger of improperly influencing the outcome of the trial by persuading the trier of fact to convict the defendant on the basis of

his prior criminal record [emphasis added]. H.R.Rep. No. 93–1597, 93d Cong., 2d Sess. 9–10 (1974), U.S.Code Cong. & Admin.News, pp. 7098, 7103.

It thus appears that under Rule 609, *all* prior felony convictions of prosecution witnesses are admissible (subject only to the time-limit restrictions set forth in Rule 609(b) ). *See United States v. Smith & Gartrell,* 179 U.S.App.D.C. 162, 173, 551 F.2d 348, 359 and n.21 (1976); *United States v. Belt,* 169 U.S.App.D.C. 1, 514 F.2d 837, 845 (1975); *United States v. Dixon & Greenleaf,* 547 F.2d 1079, 1082–1083 (9th Cir. 1976); 3 Weinstein *Evidence* ¶ 609[03] (1975) at 609–66, n.11 and accompanying text, and 609–77.