**UNITED STATES of America**

v.

**Mutulu SHAKUR, a/k/a "Doc," a/k/a "Jeral Wayne Williams," Sekou Odinga, a/k/a "Nathaniel Burns," a/k/a "Mgabasi," a/k/a "Mugubasi," a/k/a "Eddie Holmes," a/k/a "Lou," Cecil Ferguson, a/k/a "Mo," a/k/a "Chui," Edward Lawrence Joseph, a/k/a "Edward Lawrence," a/k/a "Jamal," a/k/a "Tony," a/k/a "J.R.," William Johnson, a/k/a "Bilal Sunni-Ali," a/k/a "Spirit," Silvia Baraldini, a/k/a "Louise," Susan Rosenberg, a/k/a "Elizabeth," Cheri Dalton, a/k/a "Nahanda," Iliana Robinson, a/k/a "Naomi," Nilse Cobeo, a/k/a "Nilse Lawrence," a/k/a "Ginger," a/k/a "Gigi," a/k/a "Giovanni Correa," and Alan Berkman, Defendants.**

No. SSS 82 Cr. 0312 (KTD).

United States District Court, S.D. New York.

March 31, 1983.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, Attorney for the Government; Robert S. Litt, Stacey J. Moritz, Asst. U.S. Attys., New York City, of counsel.

Jesse Berman, New York City, for defendant Cecil Ferguson.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Defendant Cecil Ferguson moves to suppress physical evidence seized from the premises located at 35 West 110th Street, Apartment 3K, New York, New York, on the grounds that the seizure violated the Fourth Amendment. In addition, he moves to suppress physical evidence seized post arrest from his person on the grounds that it was the fruit of an unlawful arrest.

## BACKGROUND

The following is the factual background as generally portrayed on behalf of the defendant. By assuming these facts for purposes of this motion, it is not to be considered that I am making them as findings of fact. I am also reciting certain assertions found in responding affidavits insofar as they are necessary for an understanding of the situation and are not denied by the defendant. At approximately 5:35 a.m. an unidentified Federal Bureau of Investigation ("FBI") agent awakened Ferguson and his wife, Nakawe Luisette Cuebas-Ferguson-El ("Cuebas"), by telephone. The agent stated that the FBI had surrounded the apartment to arrest Ferguson. Within minutes the agents were pounding on the door of Apartment 3K. Cuebas opened the door and was pulled into the hallway by the agents. Fifteen to twenty agents then pushed into the apartment breaking the door off a hinge. Ferguson offered no resistance. While Cuebas was interrogated by an FBI agent and a policewoman on the floor above, Ferguson was taken in handcuffs from the apartment. At the same time, members of the New York City Bomb Squad and other members of an emergency services team entered the apartment to check for other persons or explosives. Assisting them was a dog specially trained in the detection of explosives.

The officers found no other persons in the apartment. In addition, the dog did not indicate the presence of explosives. The dog's reaction, however, does not conclusively establish the absence of explosives, (Breslin Affidavit at 2),[1] and therefore, the Bomb Squad physically checked for explosive devices. Their physical check began with an examination of the bedroom facing east. This bedroom had a closet that was either closed or slightly ajar. In order to test the closet for explosives, Breslin tied a long string to the door knob, went into the hallway behind its thick wall, and pulled the closet door open with the string. Nothing calamitous resulted. The closet was stacked high with boxes. Looping a string around the boxes, Breslin went back out into the hallway and pulled the string. Again, no explosions resulted. Some of the boxes fell to the floor outside the closet. This test for explosives was repeated for several kitchen closets. Convinced that the apartment was not rigged with bombs, the Bomb Squad left.

FBI Agent Maxwell—who was not a member of the Bomb Squad—went into the apartment after the special team left. Walking through the apartment he spied a red-stained surgical glove[2] near the bedroom closet. It was in "plain view" on top of the boxes Breslin earlier had tipped over.

At approximately 7:30 a.m., FBI agent Cordier telephonically obtained a search warrant from Judge Haight of the Southern District of New York. The basis for the warrant was Cordier's sworn testimony regarding the discovery of the red-stained surgical glove, and the affidavit of agent Maxwell. After Judge Haight granted the search warrant, the agents conducted an exhaustive search of the apartment. The

1. Walter Breslin is a detective with the New York City Police Department Bomb Squad.

2. The surgical glove was similar to a type previously recovered during searches of various "safe houses." The glove apparently could be used to avoid leaving fingerprints, and the red coloration potentially was the red dye used by banks on stolen money to assist subsequently tracing the money.

defendant moves herein to suppress all physical evidence seized pursuant to the search and arrest warrants, and the surgical glove found in "plain view" prior to the issuance of the search warrant.

## DISCUSSION

### A. Initial Search For Persons or Explosives

It is by now deeply engraved in Fourth Amendment law that warrantless search and seizures are valid only in "a few specifically established and well-delineated" situations. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The government argues that the initial search falls within the amorphous boundaries of the exigent circumstances exception to the warrant requirement. It cites the recent line of Second Circuit cases permitting law enforcement officers who legally enter a premises to make an arrest, to carry out "a quick and limited 'security check' of the premises to be sure there are no third persons present who might destroy evidence or pose a safety threat to the officers." *United States v. Martino,* 664 F.2d 860, 869 (2d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (citing *United States v. Gomez,* 633 F.2d 999 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981)); *United States v. Agapito,* 620 F.2d 324, 335–36 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). The government argues by analogy that it was justified in searching for explosives because the agents "had ample cause to fear that Ferguson's apartment might contain explosives that would be dangerous to them or to other residents of the building." Government's Memorandum of Law at 32. The defendant responds that the government could search if at all, only if there were "probable cause" to believe that explosives were present. As expected, the defendant

contends that the government did not satisfy this standard.[3]

■ The facts of this case, however, do not require that I determine which standard of justification is appropriate. In *United States v. Agapito,* the court noted that a security check is reasonable because it "is intended to uncover only 'persons, *not things.'* " *Id.* at 336, quoting *United States v. Bowdach,* 561 F.2d 1160, 1168 (5th Cir. 1977) (emphasis added). "Once the security check has been completed and the premises secured, no further search—be it extended or limited—is permitted until a warrant is obtained." *Id.* Moreover, this case does not present the exigent circumstances present in *United States v. Martino,* which validated a seizure of evidence. In *Martino,* the court noted that the limited number of arresting officers, when combined with the co-conspirators still at large with easy access to the evidence which was in plain view in the defendant's backyard justified a warrantless seizure. This case does not present such exigent circumstances.

■ Another more compelling reason requires suppression of the glove. Even if the Bomb Squad's search of the premises was lawful, agent Maxwell's subsequent search lacks any justification. Once it had been determined that no explosives or other persons were in the apartment, agent Maxwell was not permitted to enter the apartment without a warrant.[4] Therefore, the seizure of the red-stained surgical glove is suppressed.

### B. Probable Cause for the Warrant

■ The warrant was based on the telephonic affidavit of agent Cordier. His affidavit in turn incorporated agent Maxwell's lengthy affidavit. Defendant asserts that the warrant is invalid in the absence of the red-stained glove, which now must be ex-

---

**3.** It is noteworthy that most of the incidents recounted by the government in support of the warrantless search involved bomb related activity that had occurred eight to ten years earlier.

**4.** Further, Detective Breslin, the Bomb Squad Detective who knocked the boxes over, never mentions seeing a glove though he examined the results of his efforts, and despite the government's assertion to the contrary.

cluded in determining probable cause. *See United States v. Lace,* 669 F.2d 46, 49 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). The warrant in this case stands on the sufficiency of Maxwell's affidavit which included statements by Samuel Brown and Yvonne Thomas. In another opinion, I found there was no evidence that Brown's statements had been coerced. His statements were well-corroborated, and the government did not materially misrepresent Brown's reliability. There is no necessity to examine whether Thomas' reliability was misrepresented because even without her information, the affidavits established probable cause to search the West 110th Street apartment.

Brown's information amply furnished sufficient probable cause to arrest Ferguson. Brown stated that Ferguson was an active participant in the October 20th events, and that he resided at the West 110th Street apartment. The Maxwell affidavit also included information from FBI Agent Reagan, who spent eight years underground as a member of the Weather Underground. The latter group allegedly has aligned itself with the Republic of New Africa, of which Ferguson is asserted to be a member. Reagan's information included a description of the use of apartments by these groups alleged to be associated with the October 20th events, for the storage of explosives, ammunition, and other relevant evidence of criminal activities. Together, this information established probable cause to search the West 110th Street apartment.

### C. General Search

█ Defendant Ferguson next argues that the search warrant was overbroad and authorized a general search. Overly general search warrants that allow an unabashed rummaging of a person's property are proscribed by the Fourth Amendment. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971). To overcome this constitutional limitation, the warrant must contain a "particular description" of the items to be seized. *Id.*

The warrant for the search of the West 110th Street apartment authorized the search and seizure of:

Clothing, weapons, ammunition, bomb paraphernalia, papers, materials, records, and/or documents relating to the production, use, or deployment of bombs, explosives, incendiary devices, or other weapons, or to the whereabouts, plans or meetings of members of terrorist organizations, such as the Weather Underground Organization or Black Liberation Army, and fingerprints of members of or individuals associated with those organizations, or with armoured car robberies, and other evidence relating to or evidencing crimes committed by the Weather Underground Organization or the Black Liberation Army which are fruits and instrumentalities of violations of Title 18 U.S. §§ 371, 2113, and 1962.

Defendant's primary argument is that the last phrase, "evidence relating to . . . fruits and instrumentalities of violations of Title 18 U.S.C. §§ 371, 2113 and 1962," authorized a general search because section 371 is the federal conspiracy statute. "The warrant, therefore, could be read to authorize the agents to seize evidence that the BLA was conspiring to commit election fraud, stock fraud, postal theft or any of a thousand other crimes." Defendants' Memorandum of Law at 5.

Defendant cites in support of his position *United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982). In *Cardwell,* the Ninth Circuit struck down a warrant that authorized the seizure, *inter alia,* of "books and records . . . which are the fruits and instrumentalities, of violations of 26 U.S.C. § 7201." *Id.* at 76. The government, on the other hand, suggests that the language more closely resembles the warrant upheld in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In *Andresen,* the warrant identified an "exhaustive list" of documents to be seized, and ended with the phrase, " 'together with other fruits, instrumentalities and evidence of crime at this [time] unknown.' " *Id.* at 479, 96 S.Ct. at 2748.

█ I start with the general proposition that a search warrant must be read "in a common sense and realistic fashion." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). In addition, the quoted language must be read in its context as part of a more comprehensive description of the items to be seized. *See Andresen,* 427 U.S. at 480–81, 96 S.Ct. at 2748–49. The instant warrant does cite the conspiracy statute, but it also includes a long description of the items to be seized. In *Cardwell,* the warrants authorized a seizure of all of the company business records for approximately ten years. This warrant was not so open-ended. The warrant as a whole, therefore, adequately particularized the items to be seized.

█ Defendant also argues that the warrant as interpreted and executed by the agents "became an instrument for conducting a general search." *See United States v. Rettig,* 589 F.2d 418 (9th Cir.1978). The agents seized, *inter alia,* business cards, a packet of personal correspondence, a packet of maps, a stethoscope, and various posters. All of these items could be relevant, however, in determining the whereabouts, plans, or meetings of the alleged terrorists. For example, fingerprints could be lifted off the stethoscope. Therefore, it has not been established that the agents conducted a general search.

D. Search Incident to Arrest

Ferguson argued by letter dated October 7, 1982, that the items seized from his person must be suppressed because: (1) they were the fruits of illegal electronic surveillance, (2) there were material misrepresentations in the various supporting affidavits, and (3) the arrest warrant was inadequately supported. The first two grounds were decided adversely to Mr. Ferguson in my earlier electronic surveillance decision. The third ground was discussed above. Ferguson's participation was amply demonstrated by Brown's statements, and physical and electronic surveillance. Accordingly, this aspect of Ferguson's suppression motion also is denied.

CONCLUSION

In sum, the evidence seized prior to issuance of the warrant i.e. the red-stained surgical glove is suppressed. In all other respects Ferguson's motion to suppress other items seized pursuant to the search warrant and incident to his arrest is denied.

SO ORDERED.