## UNITED STATES of America
### v.
### Linda Sue EVANS.
### Crim. No. N–85–36 (PCD).

United States District Court,
D. Connecticut.

March 14, 1986.

See also, 610 F.Supp. 101.

**1546**

Diane Polan, New Haven, Conn., for plaintiff.

Peter Clark, Asst. U.S. Atty., New Haven, Conn., for defendant.

### RULING ON MOTION TO PERMIT OPENING STATEMENT

DORSEY, District Judge.

██ An opening statement is a matter for the discretion of the court, Local Rule 12(e), and is not a constitutional right. *United States v. Salovitz,* 701 F.2d 17, 20 (2d Cir.1983); *Herring v. New York,* 422 U.S. 853, 863, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). The exercise of that discretion must be guided by the purpose of a trial: to permit a defendant a fair opportunity to present his case. If a defendant intends to call no witnesses, there is nothing to explain in advance and an argument at the conclusion of the case suffices to permit a defendant to place his views of the case before the jury. When the defendant intends to testify, that moment, on the stand, under oath, and subject to cross-examination, is an adequate opportunity for the defendant to get across to the jury his version of the facts. When a defendant intends to call witnesses, they lend additional support to the defendant's assertions.

Nevertheless, defendant argues that an opening statement serves three essential purposes: (a) to state what evidence will be presented; (b) to make it easier for the jurors to understand what is to follow; and

(c) to relate parts of the evidence and testimony to the whole. Defendant's Memorandum in Support of Motion to Permit Defendant to Make an Opening Statement at 1, citing *United States v. Dinitz*, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976) (Burger, C.J., concurring). *See also United States v. Escobedo*, 430 F.2d 14, 20 (7th Cir.1970), *cert. denied*, 402 U.S. 451, 91 S.Ct. 1632, 29 L.Ed.2d 122 (1971).

(a) It is not quite accurate to say that an opening statement explains what evidence will be presented. Although a criminal defendant benefits from liberal discovery and knows much, if not all, of the government's evidence in advance of trial, surely the defendant's opening statement is not going to outline the evidence against her. There is no comparable advance notice of what the defendant will offer, if anything. Thus, there is no ready circumscribing of what a defendant will offer, or be permitted to present to the jury in a statement. Though a corrective instruction could remove a claim made in opening that was not substantiated by the evidence, it may not offset the unfair advantage in a preliminary casting of the case for the jury. Moreover, if a claim in opening is not the subject of evidence, that may place in question the good faith of the defendant who makes such a claim. *See United States v. Dinitz*, 424 U.S. at 612, 96 S.Ct. at 1082; *United States v. Salovitz*, 701 F.2d at 20 (discussing rationales for allowing or disallowing opening statement). If the court concludes the claim was knowingly and intentionally made, it will have to grapple with the problem of determing what penalty, if any, is appropriate and feasible.

(b) It is questionable whether a mere recitation of the evidence which is to follow will help the jurors better understand the evidence when it is introduced. Yet, if the opening statement goes beyond a mere recitation, the explanation may shade into becoming an argument. *Dinitz*, 424 U.S. at 612, 96 S.Ct. at 1082.

(c) To relate parts of the evidence and testimony to the whole requires commentary. Counsel may comment on relative weight of evidence, resolution of conflicts, harmonization of evidence in the face of apparent conflict, etc. It is an analysis which approximates argument and that, as previously mentioned, is not the function of an opening statement.

On balance, preclusion of opening statements seems the better rule. Any advantage claimed to accrue to the government by the reading or paraphrasing of the indictment is countered by a recitation of defendant's denial, buttressed by instructions as to the government's burden of proof, defendant's entitlement to a presumption of innocence and the want of any obligation on defendant's part to offer evidence or prove her innocence. In most cases, the defendant's alleged need to make an opening statement for the full exercise of his constitutional rights is overshadowed by the potential for abuse and by the numerous trial problems and appeals which may result therefrom.

■ Courts that have not generally allowed opening statements have regarded them as "a privilege to be granted or withheld depending on the circumstances of the individual case." *Salovitz*, 701 F.2d at 20. Thus, when the evidence is complex and there is a significant risk of confusion or misunderstanding, an opening statement may be warranted in fairness to a defendant. *McLauth v. California*, 402 U.S. 183, 221, 91 S.Ct. 1454, 1474, 28 L.Ed.2d 711 (1971).

■ Defendant asserts this to be the kind of complicated case which warrants an opening statement. She notes the potential of 150 exhibits, scores of witnesses, covering a wide span of time. However, extensive testimony and numerous exhibits do not necessarily mean that the jury will be confused unless an opening statement is made. As against the government's claims and proof, the defendant purportedly will attempt to explain away the evidence by showing that her intent, and the motive and purpose for her conduct, was neither fraudulent nor criminal. The defense theory, and the means of attempting to convince the jury of its efficacy, is not novel or unduly complex. In view of her motion, the court will advise the jury that, as op-

posed to the intent with which she is charged, defendant claims there was an innocent intent and motive which accounts for her behavior. The court will also consider other proposals from the defense as to how the case should be introduced to the jury. Such a procedure will adequately assure defendant of fair consideration by the jury.

Accordingly, defendant's motion for permission to make an opening statement is denied.

SO ORDERED.

## RULING ON MOTION TO SUPPRESS

### I. *New York*

Defendant's motion in part applies to items seized in Apartment 12L at 3451 Giles Place, Bronx, New York. That apartment has not been shown to have had any substantial link to defendant. She was in the apartment but once insofar as the record shows, she had a key to the building, her fingerprints were found there. The latter may have been created at the time of the single visit, immediately prior to her arrest and the search of the apartment. Certainly defendant is not likely to claim that they were made at any other time lest she thereby concede probative value to that evidence on an ultimate issue.

■■■ To establish standing, it must be shown that defendant had "a legitimate expectation of privacy" in the locus searched. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Certainly the possession of a key is indicative of more than a mere fleeting relation to the apartment, but it is not controlling. Defendant could have taken possession on that one occasion when she was found there. The key suggests at least an immediate right to access, but does not necessarily suggest the power of access over a protracted period of time, as here it was shown to have been used only once. It manifests no particular authority to exclude, because there is no suggestion that the key proven was the only key. Paired with the fact that the apartment was rented in the name of another, it merely demonstrates the acquiescence of whom-

ever was the renter in defendant's possession of the key. While the key establishes a relationship between Evans and the apartment, it is but one factor in assessing an expectation of privacy there on her part.

The fact that women's clothing was found in the apartment is of little weight. Marilyn Jean Buck was also in the apartment when defendant was there and the clothing could equally have belonged to Buck.

Defendant was not the named lessee of the property and thus she had no legal possessory interest in either the apartment or its contents. There is no other evidence of the use of the apartment and it would, therefore, be speculative that she had an exclusive right of use. There is no evidence that she made any extended use of it. To the contrary, the evidence is that she had been living in Baltimore for a considerable period of time immediately prior to the single use of the New York apartment. There is evidence of a Connecticut residence for a protracted period of time prior to the Baltimore residence. It is less than likely that defendant, even had she lived a nomadic life, would have retained such a relationship as is required by *Rakas* to more than one apartment. There is no evidence that it was a residence for defendant at the time of the search. Indeed, in support of her motion to suppress, dated February 5, 1986 at 8, defendant forcefully so argues, making no claim of residency. Her single entry on one occasion when she stayed only for a short time, changed her clothes and continued on her journey, is the only evidence of her use of the apartment. The fact that when she left the apartment she went a relatively short distance and stayed over night at a hotel strongly suggests the lack of a relationship to the apartment, which would give her standing to challenge the search thereof.

■■■ On the record, it cannot be found that defendant had any reasonable basis for an expectation of privacy in the Giles Place apartment, a claim as to which she has the burden of proof. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556,

2561, 65 L.Ed.2d 633 (1980). Accordingly, for the lack of standing, defendant's motion to suppress any material taken from the Giles Place apartment is denied.

## II. *Baltimore*

An agent involved in the government's investigation testified that defendant was the lessee of and lived in the apartment at 5714 The Alameda, Baltimore, Maryland, for a period prior to May 11, 1985. Although the government has declined to concede standing, it is clear that defendant has standing to challenge the search of that apartment, having a clear and proper expectation of privacy therein. Although she had left the apartment shortly before the search and traveled to New York and beyond, where she was arrested, there is no evidence to suggest she intended to abandon the Baltimore apartment.

### A. *Facts*

On May 10, 1985, defendant was observed in the vicinity of an apartment complex with a woman presumed to be Marilyn Jean Buck and a man presumed to be Dr. Alan Berkman. There was a warrant out for the arrest of Berkman. On May 11, 1985, agents checked with the leasing office and found that one of the apartments in the complex was leased by defendant.

The agents followed two courses of action commencing at approximately mid-day on May 11, 1985. They initiated the process of obtaining a search warrant for the apartment, which was complicated by the fact that it was a Saturday. Second, the agents went to the specific building in the complex in which the apartment was located for the purpose of confirming from neighbors the identity of occupants of the apartment. Having previously seen defendant and a woman believed to have been Marilyn Buck enter and leave the complex, it was presumed that the apartment could then have had but one occupant, Dr. Alan Berkman.

While the agents were at the building and inquiring of occupants of neighboring apartments with respect to persons seen coming and going from the apartment in question, one of the agents was stationed on the stairway leading from the first to the second floor. This agent was standing several steps down from the second floor, where the apartment was located, and thus his head was at approximately the second floor level. In that position he discerned, through a space between the bottom of the door to the apartment and the threshold, the presence of someone in the apartment. No evidence as to the layout of the apartment other than the interior stairway and second floor doorway was provided by either party.

The agents thereupon determined to knock at the apartment door for the purpose of trying to obtain entry and then to arrest Dr. Berkman. The knock was answered by a female who refused entry after the agents identified themselves and announced their intention to arrest Dr. Berkman. The agents testified that they heard paper tearing and movement within the apartment. Concerned about the destruction of evidence, entry was forced and a person later identified as Lora J. Whitehorn was found to be in the apartment. Whitehorn, when identified, was known to be associated with a group suspected of substantial criminal activity of which Buck, Evans and Dr. Berkman were members. Initially and immediately, the agents did a security sweep of the apartment, that is, a visual check limited to seeing if any other person was in the apartment. No one was found. No closer inspection was then performed. Whitehorn was removed, an agent was stationed by the door and the rest of the agents withdrew to their cars in the adjacent parking lot. There, the developments as of that time were relayed to headquarters by radio and the agents awaited the arrival of a search warrant and forensic team, which was to conduct the apartment search. The report of interim developments was at least partially intended to aid in the presentation of the search warrant application.

A further concern expressed by the agents was that the apartment might contain explosives and explosive devices, particularly devices which might prove danger-

ous to agents conducting a detailed search of the apartment pursuant to the anticipated warrant. The group with which defendant, Buck, Whitehorn and Dr. Berkman had been known to have been associated was known to have possessed, and on one or more occasions used, explosives. Some members of the group had been associated with a bomb factory in New York. Though not immediately possessed with definitive information suggesting the probable presence of explosives or explosive devices in the apartment, based on the radical attitudes and extreme behavior of the group, the agents decided that, to assure the security of the apartment and the safety of the agents, the security sweep should be extended to check for explosives. An explosives expert was dispatched to the scene and spent just short of two hours searching the apartment for explosives or explosive devices. That search was a detailed, close inspection of the apartment and all of its contents, including any place therein in which explosives or an explosive device might be concealed. Most, if not all, of what was later found in the search after a warrant was obtained was observed by the explosives expert, but nothing was moved or removed and no listing of what was seen was made. As the check was solely for the presence of explosives or explosive devices, the agent took no note of any other items observed except several weapons and devices associated with explosives and ammunition. No explosives were found. One of the original agents at the scene remained either at the apartment door or within the apartment behind the expert as he did his work. That agent made no specific inspection of any part of the apartment nor any of the items or material contained therein, but merely functioned as a backup for the explosives expert. No listing of anything that he might have observed was made.

The explosives expert's inspection included a remote, basement storage area. As nothing from that area is to be offered, no suppression as to that part of the search is warranted.

Defendant claims that:

(a) The original entry, without a warrant, was unlawful.

(b) The search for explosives was unlawful.

(c) The warrant obtained was invalid because:

(1) it was obtained in part based on information arrived from the two illegal searches noted in (a) and (b) above.

(2) it was obtained based on a false and incomplete affidavit; and

(3) it was issued by other than an impartial, neutral magistrate.

### B. Discussion

 Where a person has a reasonable expectation of privacy, no search may be conducted unless such is lawful. A search authorized by a warrant would be lawful if the warrant itself was lawfully obtained. A search without a warrant is presumed to be unreasonable and, therefore, unlawful unless it comes within one of the limited set of circumstances which constitutes a recognized exception to the warrant requirement. See Welch v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984).

### 1. First Entry

The government would justify the first entry, without a warrant, on the ground of exigent circumstances. Defendant makes much of the attempted justification for the agents being at the apartment itself without a search warrant. However, there is no impropriety in the agent's presence outside the apartment nor in their knocking at the door. Without a search warrant, they could, absent more, go no further, but certainly they could go that far. They could even have attempted to obtain the acquiescence of someone authorized to permit their search of the apartment, a possibility they could not rule out without making an inquiry. There is nothing in the law to suggest that agents cannot solicit nor hope for cooperation as they go about their business. Here, they had a reasonable basis for being interested in the apartment (hav-

ing identified it from information obtained from the rental office), which was subsequently confirmed by the magistrate's issuance of a search warrant. Their interim inquiry of occupants of adjacent apartments was also appropriate and lawful as part of the continuing investigation of the whereabouts of the persons in whom they were legitimately interested.

 The presence of the agent on the stairway leading to the second floor was not improper. The agent's detection of the presence of one or more persons in the apartment by what was observable through the opening underneath the apartment door was also not unlawful. The "peek" of the agent under the apartment door was the result of the agent's particular position where he was legitimately standing. No physical intrusion into the apartment occurred nor were any mechanical or electronic devices utilized. The agent merely detected the presence of someone in the apartment and no other information significantly to be protected by the right of privacy. Thus, the "peek" will not be considered to constitute an entry which tainted all of what followed. It could as readily be said that, having failed to block the space between the door and door sill, defendant could not have expected absolute privacy any more than she could have by leaving windows uncurtained without shades being drawn. There is no evidence here that the agent did other than see what was plain to see from a position in which he could lawfully have been standing, without contrivance, contortion, close scrutiny or particular effort.

The knock on the door in the hope of accomplishing their investigative purpose and possibly the arrest of Dr. Berkman was not inappropriate. Further, there is no evidence to suggest that the agents need have anticipated anything untoward occurring upon their knocking at the door that would jeopardize the investigative process. Having knocked, the agents, in response to an inquiry from within, identified themselves and their purpose to arrest Dr. Berkman. They were greeted with a refusal to open the door on two occasions. The sounds therein indicated movement of the occupant or occupants and that documents were being destroyed before the search warrant in process could be obtained and executed.

 The arrest of Whitehorn is irrelevant to the justification for the entry. The agents, at entry, had no knowledge of her presence nor did they rely on any right to apprehend her. There is no claim of a right to enter to arrest Dr. Berkman. Although the agents had an arrest warrant for him and they may well have had probable cause for believing that he was in the apartment, they do not claim that as a basis for the entry actually made. The only exigent circumstances claimed by the government were the potential destruction of evidence. *See United States v. Vasquez*, 638 F.2d 507, 529–32 (2d Cir.1980). Agents need not stand idly by while such destruction occurs and wait for a warrant to arrive. *See United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.1973); *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966); *United States v. Bethea*, 387 F.Supp. 969, 971 (D.Conn.1975).

 The agents' knowledge of the occupants of the apartment and the use of it in relation to known fugitives and the facts found with respect to the agents' reasonable suspicions leads to the conclusion that the agents had a legitimate concern that potential evidence probative of criminal acts might well have been destroyed had they not sought to preserve same by the warrantless entry. Thus, exigent circumstances requiring immediate action and constituting an exception to the requirement of a warrant justified their entry at that time. The fourth amendment bars only unreasonable searches. A warrantless search under exigent circumstances is not an unreasonable search. Although law enforcement agencies bear a heavy burden of proof of exigent circumstances when a warrantless search occurs, *see Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967), the government has met its burden in this case.

■ Defendant's reliance on *United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974), is misplaced. Here, the agents were in the process of obtaining a search warrant and did not themselves create the exigent circumstances which precipitated the warrantless entry. They had no reason to anticipate that an attempt to destroy evidence would follow the knock at the door and, unlike *Rosselli*, they had no definitive knowledge that destructible contraband was even on the premises. The agents "had a right to pursue their investigation by seeking voluntary cooperation," *id.* at 630, and it cannot be found that the agents should have known that their attempt to obtain voluntary admittance would lead the female occupant at the apartment to engage in conduct which gave rise to a reasonable belief that evidence was being destroyed. While "it is easy to misinterpret sounds on the other side of a closed door," *id.*, once the activity creative of those sounds occurs, the agent has two choices— to wait for a warrant or to act to preserve the status quo. If it is then reasonably necessary to act to preserve the status quo, to do so is not violative of the fourth amendment. The numerous factors set forth in *Rosselli, id.* at 631, have been considered, and it is thereupon found that the entry here was not unreasonable based on the exigent circumstances then prevailing.

### 2. *Initial Inspection of Premises*

■ Having found that the initial entry was lawful, the next question is the propriety of the search of the apartment then conducted. The agents swept the apartment for the presence of other persons than Whitehorn. They looked only in those places in which a person could be located. There was no meticulous search of either the apartment or its contents. The government justifies the sweep to secure the premises and protect the agents then present. Apart from the belief that Dr. Berkman may have been present, the unlawful activities of those associated with the apartment included violence. The sweep was short in duration and limited in scope. There is no showing that it exceeded the bounds reasonably necessary to accomplish its purpose, which was not unlawful. As the agents' presence in the apartment has been found to have been lawful, their "quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers" was lawful. *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980); *see Vasquez*, 638 F.2d at 530 and cases cited.

### 3. *"Bomb" Sweep of Premises*

■ After the initial sweep, the agents exited the apartment leaving the door guarded by one agent, who stood in the hallway outside. The agent in charge at the apartment requested an explosives expert to be sent to check the apartment for explosive material and devices. That search was done prior to issuance of a search warrant. Thus, that search would be deemed unreasonable, unless, as the government claims, it was justified by exigent circumstances. That an application was in process suggests that a warrant would, if at all, be forthcoming shortly. The agents' concern was for the presence of explosives and detonating devices which might have either constituted a general threat or a specific threat to an agent performing a search pursuant to a warrant. The justification offered for the search was on the basis that the group had, several years prior, come into possession of dynamite, which over a period of time tends to deteriorate and thereby become fragile and easily explodable. The "exigent circumstances" exception to the warrant requirement was intended to provide flexibility when agents are faced with a crisis, a pressing, demanding set of circumstances. Thus, an exact formula is neither necessary nor intended.

■ Here, the agents were working against the background of criminal conduct by the group with which Buck, Berkman and defendant were associated. The group was suspected of possessing a large cache of dynamite, not all of which could be accounted for. The group had a history of

violence and indifference to the lives of others, although their targets had not generally been people. Explosives had been used against a number of buildings. An explosives factory existed. Members of the group had been found in possession of explosives and detonating devices and equipment as recently as November of 1984. Although there was no history of explosive devices rigged in a hide-out as a booby-trap for agents, the Nyack robbery showed a total disdain for the lives of law enforcement officers.

However, the criminal background of the group does not, in itself, justify the particular bomb search made in this case. The only possible, pressing, immediate concern would have been that the occupant of the apartment could have triggered detonating devices while the agents were kept outside of the apartment. Yet, the principal activity of which there was note was a running about and a tearing of paper. There was no mention of any periods of silence in which a mechanism might have been activated. But more striking, there had never been an occasion when a residential building had been targeted by the group. The bomb factory in New York blew up with group members inside, obviously an accident. No use of explosives occurred where people were known to be present, although on some of the occasions there certainly was the risk of such exposure. Here, there were other inhabited apartments in the building. The violence of the group toward law enforcement had occurred only when arrests were imminent. Booby-traps were not shown to have been the group's modus operandi. Under different circumstances, a bomb search exception would not be beyond reason or logic, but here there was no justification for proceeding prior to the issuance of the search warrant. The premises were empty, guarded and secured, and the warrant had already been requested. A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation," *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968), and, as in *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978), "it simply cannot be

contended that this search was justified by any emergency threatening life or limb." If there was concern about the safety of the agents, they should have waited outside until the search warrant arrived and then a bomb search could have legally proceeded prior to the general search. Whether judged by the standard of probable cause or reasonable belief, *see United States v. Shakur,* 560 F.Supp. 361, 364 (S.D.N.Y.1983), the government has failed to demonstrate that a warrantless bomb search was justified in this particular instance.

### 4. *Extent of Suppression*

Defendant presented evidence that, in the course of the bomb search, the explosives expert found and reported several weapons, explosive related mechanisms and material, and ammunition. Though other material was exposed, he did not concentrate on those items. He read none of the papers nor files he checked for explosives.

■■■ The weapons, explosive devices and ammunition will be suppressed, but defendant claims that "taint of a poisoned tree touches everything in the apartment," citing *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). That rule cannot be applied here because the first entry has been found to be lawful and, contrary to defendant's assertion, the evidence is clear that a search warrant application, extending to a substantial portion of the breadth of the warrant as ultimately issued, was in process from some time after the rental agent's identification of the apartment as belonging to Evans. The information contained in the affidavits for the warrant was an "independent source" for the discovery and seizure of all evidence pertaining to the harboring of fugitives (including using, making and acquiring false identifications) and the locations of hide-outs used by any group members known to be fugitives (in-

**1554**

cluding Dr. Berkman, Buck and Evans). *See Segura,* 104 S.Ct. at 3391. Other than U21 submachine guns and the weapons, explosive devices and ammunition previously discussed, the bomb search turned up nothing that was not included within the scope of the warrant.

Accordingly, the motion to suppress is denied, except as to the weapons, explosive devices, mechanisms and ammunition.

### 5. *Deficiency of Affidavit*

■ Defendant asserts that the search warrant should be invalidated because it was supported by a false and incomplete affidavit. While the affidavit does contain some unexplained inconsistencies, they have not been shown to have resulted from intentional falsehoods or omissions intended to mislead the magistrate. When a warrant is applied for as events are occurring in the field and new information is being received from many different sources, it may be difficult for the agent executing the supporting affidavit to present a totally consistent account. The absence of any substantial, flagrant, known, intentional errors of inclusion or omission bars invalidation of the entire warrant and search process. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

However, the government should be alert to the fact that problems with the mechanics of gathering the information and presenting it to the magistrate can shade into sloppiness, imprecision, inadvertent falsehood and to intentional misrepresentation. As the party interested in preserving the integrity of the warrant and search process, it ill behooves the government to be less than meticulous and forthright in its presentation to the magistrate and in turn to the court.

### 6. *Neutrality of Magistrate*

■ Defendant challenges the neutrality of the magistrate because he suggested that the warrant application and warrant itself include items, one or more of which had already been found in the bomb search. However, that is not evidence of such involvement in the application for the search warrant as to disqualify the magistrate on grounds that he lacked the requisite neutrality. The limited conduct attributable to the magistrate in the course of the search warrant is not comparable to that in *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), where the Town Justice issued and signed an open-ended search warrant, participated in the search and seizure, and allowed the warrant to be completed based on the results of the search.

### III. *Summary*

For the foregoing reasons, defendant's motion to suppress with respect to the New York apartment search and any fruits thereof is denied. Defendant's motion to suppress with respect to the Baltimore search and any of the fruits thereof is granted with respect to any weapons, explosive devices or related equipment, and ammunition. Otherwise, defendant's motion to suppress with respect to the Baltimore search and the fruits thereof is denied.

SO ORDERED.