**UNITED STATES of America**

**v.**

**John ATKINSON, Defendant.**

**No. 86 CR. 632 (PKL).**

United States District Court,
S.D. New York.

Feb. 2, 1987.

Caesar D. Cirigliano, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant; David B. Levitt, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., for the U.S.; Richard W. Roberts, Asst. U.S. Atty., of counsel.

LEISURE, District Judge:

The defendant John Atkinson is charged by indictment with unlawfully, knowingly and wilfully possessing an explosive bomb, on Governor's Island, from some time prior to June 1, 1986 to on or about July 15, 1986. 18 U.S.C. §§ 6 and 13; New York State Penal Law, § 265.02(2). On September 11, 1986, defendant moved requesting (1) a pre-trial hearing to determine the ad-

missibility of evidence seized from a locker assigned to defendant's family and of defendant's statements and (2) an order suppressing, at the trial of the case, the physical evidence seized from the locker and post arrest statements made by the defendant on the date of the arrest. After the Court reviewed the submissions of both sides, it scheduled a suppression hearing. The suppression hearing was held on November 25, and November 26, 1986. The following decision is based on the facts adduced at that hearing and the papers submitted by both sides.

### FINDINGS OF FACT

Lance Royes is a teenager who lives on Governor's Island with his parents. (Tr. 85, 87, 110–111).[1] His father is a chief petty officer with the Coast Guard. (Tr. 109–110.) On July 14, 1986, Royes' mother informed Chief Warrant Officer William Shamel that Royes had run away from home. (Tr. 87.) Shamel is the chief of the security police on Governor's Island. (Tr. 55, 84–85.) Shamel had been aware for about one year that Royes was suffering from severe emotional problems which required the attention of a psychiatrist or psychologist. (Tr. 97, 107). These problems included an inability to behave properly and an inability to get along with his peers. (Tr. 97.) Furthermore, when she reported her son missing, Mrs. Royes told Shamel that her son had been depressed and unhappy and had been meeting with a psychiatrist. (Tr. 97, 108.)

On July 15, 1986, Royes was arrested in Manhattan by the New York City Police Department ("NYPD") for possession of an unlicensed, loaded revolver. He was taken to the 10th Precinct police station. He was later joined there by his mother. (Tr. 10–11.)

Sergeant Alfred King, a detective supervisor, has his office in the 10th Precinct. He has been a member of the NYPD for 13

---

1. References in the form "Tr. ___" are to the transcript of the proceedings at the suppression hearing; references to the exhibits are to the exhibits submitted in evidence during the hearing.

years. He learned that Royes wanted to provide information concerning another allegedly armed individual, who also purportedly possessed a bomb, said individual subsequently identified by him as defendant Atkinson. (Tr. 9–10, 26.)

Royes, with his mother, was brought into Sergeant King's office. Both Royes and his mother were informed of Royes' *Miranda* rights. Royes and his mother waived those rights. (Tr. 11.) After volunteering to speak with King, Royes admitted that he had stolen a gun from his parents and had been in possession of the gun. (Tr. 12, 19.)

Royes also told King that he had witnessed Atkinson make a bomb and that he had seen the bomb earlier that day. Royes described the device as a brass 40 millimeter shell filled with gunpowder and nails, with a rag—soaked in either kerosene or gasoline—packed into the casing. King testified at the suppression hearing that Royes informed him that one end of the shell was taped with two wires extending from it to batteries and an alarm clock. (Tr. 13, 39, 51, 58.)

Sergeant King testified that compressed gunpowder explodes when ignited. He stated that loose gunpowder merely burns when lit. Sergeant King, however, did not ask Royes how tightly the rag was stuffed into the casing. Moreover, King did *not* ask Royes whether the bomb was live or actually set to explode. (Tr. 39, 47.)

During the questioning, Royes indicated that the device was located in a storage bin in the basement of a residential building, Building 877, on Governor's Island. (Tr. 13, 46–47, 57.) Building 877 is a 12–story apartment building, the largest residence on the island. There are approximately 192 apartments in Building 877, in which 865 persons reside. (Tr. 86.) The basement of the building is divided into individual storage bins. Each apartment is assigned its own bin. (Tr. 61.)

After acquiring this information from Royes, King telephoned the police chief's office on Governor's Island. King spoke with Officer Angel Fragoso. Fragoso has been an investigator with Governor Island's security police for the past three years. (Tr. 54–55, 57.) King asked Fragoso whether there was a Building 877 on Governor's Island and whether the building contained any storage areas. Fragoso responded affirmatively to both questions. King then informed Fragoso that he had Royes in custody at the 10th Precinct. He also told Fragoso that Royes had described a 40 millimeter brass casing stuffed with nails, gunpowder and rags together with an alarm clock located in a storage bin in Building 877. (Tr. 58.)

While King waited on the telephone line, Fragoso relayed this information to Chief Warrant Officer Shamel. Shamel did not speak to King; instead he directed Fragoso to talk to Royes in order to discover as many of the details concerning the bomb as possible, particularly those regarding the construction and location of the device. (Tr. 59, 86.) Royes gave Fragoso the same description of the bomb as he had given King. (Tr. 59.) Royes also told Fragoso that an AK–47 Rifle was located in the storage bin. From this description of the bomb, Fragoso concluded that the bomb was set to go off. (Tr. 103, 106–107.) Royes, however, never told Fragoso that the bomb was set to explode or was capable of being detonated.

In addition to describing the bomb for Fragoso, Royes also told him how to locate the particular bin. Royes, however, failed to describe where, in the bin, the bomb was located. Fragoso then briefed Shamel regarding the situation.

After speaking with Fragoso, Shamel contacted his superior officer. Shamel, upon consultation with his superior officer, decided to conduct a warrantless search of the storage bin. Shamel testified that he failed to even discuss with his superior officer the possibility of obtaining a phone warrant or acquiring consent from Atkinson's parents and the owners of the bin,

the Sacketts [2], to search the bin. (Tr. 114.) Moreover, during this discussion, Shamel specifically recommended that the security police *not* evacuate Building 877. (Tr. 118.) Shamel then ordered Officer Rick St. Pierre to coordinate the search of the bin; Officer Fragoso, Officer Fletcher and another unnamed officer were ordered to accompany St. Pierre. (Tr. 67.)

Shamel then notified his superiors as well as the fire department and the New York City bomb squad. Only after Shamel had issued the order and notified these various branches of the government did he finally phone King. King told Shamel that he thought the device was probably a pipe bomb made from a 40 millimeter shell casing. (Tr. 89.) [3]

Only after speaking to King, did Shamel ask for and receive Mrs. Royes' permission to speak to Royes. Royes once again said the bomb was in the Sacketts' storage bin and again described the location of the bin. (Tr. 90–92.) Shamel testified at the suppression hearing that he knew Royes well because Royes was Shamel's neighbor and had visited Shamel's home. Shamel further stated that he saw Royes every day when he came home from work.

Aside from their relationship as neighbors, Shamel had only one semi-official contact with Royes prior to ordering the search of the bin. (Tr. 94.) On that occasion, Shamel had questioned Royes regarding other island children's apparently credible complaints that Royes had threatened other children with a knife. Royce had denied any wrongdoing; at this time Shamel did not believe he was being truthful. (Tr. 94, 111.)

During Shamel's discussion with Royes over the phone, Royes stuttered somewhat and sounded frightened to Shamel. Such behavior was particularly noticeable to Shamel because Royes was ordinarily haughty and overbearing. Shamel testified that he believed Royes was being truthful regarding the bomb. (Tr. 96.) [4]

Shamel also knew the defendant. Atkinson was friends with Shamel's son and visited Shamel's home quite frequently. Atkinson would converse with Shamel during these visits. (Tr. 98–99.) Shamel testified that Atkinson's conduct was aberrant by the standards of Governor's Island. Atkinson had dropped out of school but was not working. He had developed a slovenly appearance. He was also banned from his parents' apartment. Finally, Shamel noted that Atkinson wore shirts bearing antisocial slogans. (Tr. 100–101.) In Shamel's opinion, constructing a bomb was something Atkinson might do. (Tr. 99–100.) Shamel felt this way even though he never knew Atkinson to handle weapons or build bombs in the past. Moreover, Shamel knew of no prior violent acts on the part of Atkinson. (Tr. 112.)

At approximately the same time Shamel was speaking with Royes, Fragoso and St. Pierre were searching the bin. Neither officer wore any protective gear or used any protective equipment. (Tr. 118.) The officers broke the lock to the door of the bin and then searched throughout the bin for approximately 10 minutes. (Tr. 72.) During the search the officers opened several bags and boxes. Fragoso eventually found a small blue gym bag. (Defendant's Exhibit 4.) The bag was not full. Fragoso felt the exterior of the bag and discerned a hard object inside that he believed could be

---

**2.** The Government has not challenged Atkinson's standing to complain about the search.

**3.** There was testimony at the hearing that forty millimeter shells are approximately 3 inches in diameter and come in two lengths: approximately 8 to 12 inches long and approximately 3 to 4 inches long. King and Shamel were aware of the smaller size shells, although Fragoso was not. It is undisputed that there were none of the longer shells in inventory on the island in July, 1986. (Tr. 51, 69, 89–90.)

**4.** The Court notes that Shamel did not directly speak to Royes until after he had issued the order, therefore, it is unclear how much significance the Court should attribute to Shamel's judgment regarding Royes' truthfulness to the extent that this judgment is dependent on Shamel's observations during their phone conversation.

the bomb. (Tr. 72–74.) He opened the bag and found the explosive device. The device was made from a 50 caliber shell casing, approximately 3 inches long. The officers then seized the bag and its contents.

## CONCLUSIONS OF LAW

*Probable Cause to Enter and Search the Storage Bin*

■ In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court replaced the *Aguilar-Spinelli*[5] two-prong test of reliability of informants' tips with a "totality of the circumstances" approach. The Court adopted this new standard because "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates, supra,* 462 U.S. at 232, 103 S.Ct. at 2329. Under this new approach, the Court looks at an informant's "veracity," "reliability," and "basis of knowledge" under the "totality-of-the-circumstances" in determining the value of the informant's report in establishing probable cause. *Id.* at 233, 103 S.Ct. at 2329. "Unlike the *Aguilar-Spinelli* test, which required the tip independently to satisfy both the veracity/reliability and basis of knowledge criteria, the *Gates* test permits a deficiency in one criterion to be compensated by a strong showing in another, or by some other indicia of reliability." *United States v. Roberts,* 747 F.2d 537, 543 (9th Cir.1984). Under this test, the Court's task is "to make a practical, common-sense decision whether, given all the circumstances set forth ... before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332.

Atkinson argues that the information provided by Royes was not a sufficiently reliable basis for establishing probable cause. Atkinson concedes that Royes claims to have been an eye witness to the crime. However, Atkinson correctly points out that Royes, although not an anonymous tipster or a professional informant, is hardly a reliable ordinary citizen informant. Unlike the informants in the cases cited by the Government[6], Royes was not a victim of Atkinson's alleged crime nor was he a simple witness of it. In addition to challenging the reliability and veracity of Royes, Atkinson argues that at the time of the search of the Sacketts' locker, sufficient data had not been gathered corroborating the informant's account of the defendant's complicity to warrant a finding of probable cause.[7]

As already noted, Atkinson does not dispute that Royes' "basis of knowledge" is personal observation. However, Atkinson strongly attacks the other elements the Court must weigh in determining whether there was sufficient probable cause to justify searching the Sacketts' bin.

First, Atkinson argues that the law enforcement officers should have been extremely skeptical of the information Royes provided because he did so while he was under arrest. Experienced law officers are aware that it is not unusual for a prisoner to "turn" informant in order to ease the conditions of his own arrest. Nevertheless, Sergeant King stated that he believed Royes was being truthful with him because Royes' mother was present during the questioning and because Royes was incriminating himself with respect to the stolen gun. The validity of King's belief regarding the salutary effect of the presence of Royes' mother notwithstanding, it is still not logical to assume that because King believed Royes was telling the truth about his own crime of the theft and possession of the weapon, that the information provid-

---

**5.** *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**6.** *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), *United States v. Rollins,* 522 F.2d 160, 164 (2d Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976) and *United States v. Nilsen,* 482 F.Supp. 1335, 1340 (D.N.J.1980).

**7.** *See United States v. Rueda,* 549 F.2d 865 (2d Cir.1977).

ed by Royes regarding Atkinson's alleged crime was particularly reliable. This is especially true since Royes never incriminated himself with respect to the crime about which he was informing, the construction and possession of a bomb; none of the information provided by Royes implicated him in the construction of the bomb or even in the gathering of the materials necessary to build it. *See United States v. Miley,* 513 F.2d 1191 (2d Cir.1975). In addition, unlike *Rueda, supra,* 549 F.2d at 865, nothing Royes told the law enforcement officers regarding Atkinson even incriminated Royes with respect to the weapons charge for which he was in custody.

Officer Fragoso testified that he *was* concerned with Royes' veracity and reliability. (Tr. 75.) He did not inform the Court upon what basis, if any, he eventually came to rely on Royes. Although the Court is aware that it was not Fragoso's decision, *per se,* to search the bin without a warrant, I merely note that Fragoso's lack of faith in Royes is indicative of the absence of probable cause for searching the bin.

Shamel possessed extremely strong reasons for doubting Royes' reliability and veracity. First, Shamel testified that he had been aware for a full year prior to Royes' arrest that the teenager was severely emotionally disturbed and was unable to adjust and behave properly with his peers. (Tr. 97, 107.) Mrs. Royes reminded Shamel of her son's difficulties by telling Shamel, when she reported her son missing, that Royes was extremely depressed and was seeing a psychiatrist.

In light of Shamel's awareness of Royes' substantial emotional instability, Shamel's testimony at the suppression hearing, that he believed Royes' information was reliable, is scarcely credible. The reasonableness of Shamel's reliance on information provided by Royes is especially doubtful because on the sole occasion, prior to the instant matter, when Shamel questioned Royes in an official capacity, Shamel concluded that Royes was being untruthful. The Government's attempt to distinguish this first incident—where the children on Governor's Island accused Royes of threatening them with a knife—from Royes' later arrest, is unconvincing. The Government first suggests to the Court that the two situations are not parallel because in the first instance Royes himself was in trouble, whereas on the latter instance only Atkinson was in jeopardy. Not only is this position not entirely correct—Royes was, after all, being held at the 10th Precinct for the theft and possession of a firearm—but it also cuts against the Government's earlier argument that Royes was credible because he was in serious trouble. Aware of its precarious postition, the Government then tries to make much of the fact that during Shamel's questioning of Royes regarding the first incident, Royes did not falsely accuse another child of threatening the island children. The Court's only response to this argument is that it is not the sort of circumstance upon which the credibility of an informant should be securely based.[8]

In any event, the information provided by Royes is only one of the totality of the circumstances the Court must consider under the approach set forth in *Gates.* The Government argues that in addition to Royes' tip, the law enforcement officers effectively corroborated the information provided by Royes. First, the Government notes that the type of device described by Royes could have been, in the opinion of King and Fragoso, a real explosive device. However, this is more an example of bootstrapping, than of an effort at independent corroboration; King and Fragoso were in a sense corroborating Royes' tip with information provided in Royes' tip. Furthermore, since Royes lived on a military island and his father was in the military, it is not unlikely that Royes knew how to describe accurately such a bomb, even without hav-

8. Again the Court notes, for the sake of clarity, that whatever reasons Shamel gave, based on Royes' manner on the phone, for his belief that Royes was being truthful, are not relevant to the discussion herein. Shamel had *already* given the order to search the Sacketts' bin without a warrant *prior* to speaking to Royes on the phone.

ing observed the one allegedly constructed by Atkinson.

The Government, in fact, makes a similar point in support of its position that it effectively corroborated Royes' tip. The Government notes that Shamel and Fragoso knew Atkinson had resided on the military island for several years, and that his father was an electronics technician. On merely this basis, the Government urges the Court that it is reasonable to conclude that Atkinson would know how to make such a device and would do so. Moreover, the Government indicates that because 40 millimeter shells were kept in the island's Coast Guard inventory, that this fact also corroborates the possibility that Atkinson had obtained such a shell casing.

Finally, Shamel testified at the hearing that Atkinson's aberrant behavior—by the standards of the island—made it reasonable to conclude that he would have had the propensity to construct such a bomb. More particularly, it appears that Shamel believed that Atkinson would construct a bomb because Atkinson was unemployed; not in school; wore T-shirts bearing anti-social slogans; sported an eccentric hairdo; and wore an earring. Such a conclusion is patently unreasonable. As the defendant notes, "[y]oung men who fit this description abound in New York City. There is nothing to indicate that they are more likely than anyone else to make bombs." Defendant's Proposed Findings of Fact and Conclusions of Law, 11.

The only truly independent pieces of evidence corroborating Royes' tip are as follows: Building 877 did actually exist on Governor's Island; it had a storage area; and Royes accurately described where the Sacketts' bin was located in the storage area. However, even without witnessing the alleged crime, Royes would know about the building and the storage area because he lived on Governor's Island. The building was the largest residential structure on the island. Most residents would have vis-

ited, at one time or another, the storage area and so would know of its existence. Finally, the fact that Royes knew specifically where the Sacketts' bin was located is certainly far from dispositive of the corroboration issue. Atkinson does not deny that he was a friend of Royes. It would not be unusual for friends to have visited the storage bins together for reasons other than to construct a bomb. Moreover, the Court notes that Royes did not describe specifically where in the bin the device was allegedly stored.

The Court also points out that the law enforcement officers—faced with a patently unreliable witness—failed to contact Atkinson's parents or others, such as neighbors or friends, to investigate the reasonableness of Royes' tip. The officers did not bother to inquire concerning whether Atkinson might have the expertise necessary to construct such a bomb. None of the officers even checked to determine whether Atkinson had a prior criminal record. Furthermore, Shamel did not even discuss with his superiors the possibility of obtaining consent from the Sacketts or acquiring a phone warrant. Yet despite not taking these perfunctory preliminary steps, Shamel ordered a warrantless search, even though he testified at the hearing that he never knew the defendant to handle weapons, build bombs, or commit any violent acts.

 In sum, the Court holds that the totality of the circumstances indicates that the law enforcement officers lacked the requisite probable cause to search the Sacketts' bin. The informant upon whose tip the officers primarily based their search was unreliable. Moreover, in light of the manifest unreliability of Royes, the officers' attempts at corroborating Royes' tip were insufficient to overcome this severe deficiency. Thus, the search of the Sacketts' compartment violated the Fourth Amendment, and the fruits of that search must be suppressed.[9]

---

**9.** Atkinson also argues in the alternative that even if there was probable cause to search the bin the specific search of the gym bag was

without probable cause, exceeded the authority of the search, and was vitiated by the ten minute search within the bin. Because of the deci-

*Exigent Circumstances Did Not Exist to Justify the Warrantless Search*

██ This Court also holds that even if the officers had probable cause to search the bin, the warrantless search was improper because there were no exigent circumstances.[10] "It is by now deeply engraved in Fourth Amendment law that warrantless search and seizures are valid only in 'a few specifically established and well-delineated' exceptions." *United States v. Shakur*, 560 F.Supp. 361, 364 (S.D.N.Y.1983) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). Those exceptions are "jealously and carefully drawn," and the burden is on the Government to demonstrate that the "exigencies of the situation" made a warrantless search "imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 454–5, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). "The government must show, in other words, that the [officers] were confronting an 'emergency law enforcement situation,' and that their 'urgent need' to act as expeditiously as possible justified a warrantless search." *United States v. Martin*, 562 F.2d 673, 676–77 (D.C.Cir.1977) (citation omitted). The totality of the circumstances must be examined to determine whether an urgent need existed that justified a warrantless entry. *See United States v. Farra*, 725 F.2d 197, 199 (2d Cir.1984); *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982); *United States v. Campbell*, 581 F.2d 22, 25–26 (2d Cir.1978).

The Government argues that there were exigent circumstances in the instant case that justified a warrantless search. The Government relies on the information provided by Royes—an informant this Court has already found to be unreliable and unbelievable, for the reasons previously stated—and the law enforcement officers' meager attempts to corroborate this testimony for its position. According to the testimony of Fragoso and Shamel, they believed, based on their interpretation of

Royes' description of the device, that the bomb could have exploded at any moment, endangering residents of the building. Therefore, the Government concludes, the officers had no reasonable choice but to locate and secure the bomb as quickly as possible.

██ Even if this Court were to assume that Royes' tip was reliable—that there was probable cause to believe that there was a bomb in the Sacketts' bin fitting the description he gave the police—there is still not a sufficient basis to hold that exigent circumstances existed which justified a warrantless search. Neither the Government or the defendant has cited Second Circuit authority which is dispositive of the issues now before the Court. The case law, however, indicates that the mere belief that a bomb might be in the Sacketts' bin would not create the necessary exigent circumstances.

In a recent case decided by the Federal District Court for the District of Connecticut, *United States v. Evans*, 629 F.Supp. 1544 (D.Conn.1986), Judge Dorsey held that "the government ha[d] failed to demonstrate that a warrantless bomb search was justified...." *Id.* at 1553. The court suppressed the evidence uncovered by the search, even though the government had a reasonable basis to believe, at the time of the search, that the group of defendants, whose apartment was the subject of the search, "had, several years prior, come into possession of dynamite, which over a period of time tends to deteriorate and thereby become[s] fragile and easily explodable." *Id.* at 1552. Judge Dorsey was also not persuaded to uphold the search by the following facts: (1) the group of defendants had a *"history of violence and indifference to the lives of others ..."*; (2) they had *previously used explosives* "against a *number of buildings"*; (3) they operated an "explosives factory"; (4) "[m]embers of the group had been found in *possession of*

---

sion herein, the Court does not deem it necessary to reach these arguments.

10. The Court discusses this issue for reasons of judicial economy, even though the decision herein makes it unnecessary to decide this question.

*explosives and detonating devices and equipment ...* "; and (5) a previous robbery by the group "showed a *total disdain for the lives of law enforcement officers.*" *Id.* at 1552–53 (emphasis supplied). Judge Dorsey explained that the premises were empty and the police had secured the building. He further held that the police "should have waited outside [the building] until the search warrant arrived and then a bomb search could have legally proceeded...." *Id.* at 1553.

In another decision in this area, *United States v. Ramapuram,* 632 F.2d 1149 (4th Cir.1980), *cert. denied* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), a case actually decided on the grounds of reasonable expectation of privacy, the court held that the risk of dynamite is "not simply inherent, but would depend on the particular destructive intent of [the defendant]." *Id.* at 1153 (citation omitted). In an earlier case, *United States v. Melville,* 309 F.Supp. 829 (S.D.N.Y.1970), Judge Pollack held that a search incident to a warrantless, but lawful, arrest was valid. The Court, however, based its decision on the following:

> An emergency situation and grave concern for public safety confronted the authorities. Explosions had rocked four major buildings in the City of New York within a day or so [of the search] and [the co-]defendant ... had been apprehended [the evening of the search] with dynamite bombs believed to be intended for the destruction of United States Army property. [The co-defendant] had that afternoon left a package in the [searched defendant's] apartment.

*Id.* at 831. Thus, a fair reading of *Evans, Ramapuram* and *Melville* indicates that exigent circumstances are present only if

there is a reasonable belief in the defendant's destructive intent or imminent danger is posed by the explosives.

In a similar case, *Martin, supra,* 562 F.2d at 676, the court held that "while a threat to the safety of police or bystanders may in some circumstances justify an immediate warrantless search" the belief that a machine gun was in a carrying case did not justify such a search. *Id.* at 679–680. There was no immediate threat from the gun because the police had secured the area. In so ruling, the court explicitly stated that the mere fact that "the item being sought (i.e., a machine gun) was dangerous contraband" did not create the requisite exigency. *Id.* at 679.[11]

In the instant matter, as in *Martin,* the officers had no evidence that Atkinson had any "destructive intent" with regard to the device found in the Sacketts' bin. In addition, the officers had no basis upon which they could have formed a reasonable belief that the device presented an imminent threat. In fact, Shamel testified that he did not have any reason to believe that Atkinson had handled weapons or built bombs in the past and that he did not know of any prior violent acts committed by Atkinson. *See Evans, supra,* 629 F.Supp. at 1553. The fact that the device was "dangerous contraband," in and of itself, did not create an exigency.

Despite King's and Fragoso's gloss on Royes' tip, Royes never told either officer that the bomb was "live" or "set to go off." (Tr. 47.) The officers never asked Royes this crucial question. (Tr. 47.) At the suppression hearing, neither King nor Fragoso claimed to be particularly knowledgeable with respect to explosives, yet they hastily concluded that the device was "live". King never asked Royes how tight-

11. *Martin* and the instant matter are distinguishable from *United States v. Johnson,* 467 F.2d 630 (2d Cir.1972), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973), where the court upheld a warrantless search. In *Johnson* the presence of a shotgun presented an imminent threat since it was located in a suitcase in a "transient and high crime" alleyway and was believed to have been recently used in a bank robbery. *Johnson, supra,* 467

F.2d at 638–639. The Court also here notes that the suitcase in *Johnson* was found outside the defendant's residence, near the rear door of the apartment building. *Id.* Furthermore, the court in *Johnson* relied on the fact that the "suitcase[ ] could have been removed from [its] position outside the apartment building at any moment" and compared the suitcase to an automobile in the context of its ease of transport. *Id.*

ly the device was "stuffed" or how much pressure the device was under. In any event, King conceded at the hearing that he did not know how much pressure the gunpowder would have had to been under for it to explode. Therefore, it is unclear upon what grounds the Government would have the Court rule that the officers' belief, that the device was set to go off, was reasonable.[12]

Fragoso's testimony at the hearing indicates that neither King nor Royes told Fragoso that the bomb was actually set to go off. In fact, Fragoso stated that he based his opinion that the bomb was live on his understanding that "both the bomb and the clock were in the same area at the same time." (Tr. 64.) However, there is nothing in the record to indicate that Fragoso knew whether the clock was connected to the bomb or whether any of the law enforcement officers knew whether the gunpowder was sufficiently compressed to be capable of exploding.

Shamel—who, after consulting with his superiors, actually decided to order the warrantless search—testified that he did not recall who had informed him that the device was "live". Only after his recollection was refreshed did Shamel recall that "Fragoso stated to [him] that Sergeant King told [Fragoso] that Lance Royes made the statement that the bomb was set to go off." (Tr. 106–107.) However, as the Court has already stated, King testified that Royes never told him the bomb was "live". Moreover, Fragoso testified that he based his opinion regarding the bomb's status on the fact that the clock was present in the bin. Therefore,

if Shamel indeed heard someone say that the bomb was live, he must have heard it directly from King or Royes. Shamel spoke with King and Royes *after* the search had commenced. (Tr. 103.) Thus, even if King or Royes did tell Shamel that the bomb was live, the statement was irrelevant to his finding of exigent circumstances, since the search had commenced before Shamel spoke with King and Royes.

Defendant's Proposed Findings of Fact and Conclusions of Law, 20 (emphasis in the original).

▮ In addition to the aforementioned reasons for holding that there was no exigency justifying a warrantless search in this matter, the officers' actions indicate that they did not truly believe that the bomb was set to go off. First, although Shamel stated at the hearing that the "most exigent of circumstances" was that the bomb was ready to go, neither he nor Fragoso stated anything in their reports of the incident regarding their assumptions that the bomb was "live". (Tr. 76, 115–116.) Furthermore, Shamel recommended to his commanding officer that the building *not* be evacuated. (Tr. 118.) Shamel also testified that the purpose of the search was to locate and not dismantle the bomb. (Tr. 125.) Moreover, despite the fact that "[t]here is no published guidance within the Coast Guard on the use of protective equipment or search devices ...", (Tr. 125), it is remarkable that the officers did not wear or use any protective gear during the search. Finally, Fragoso's testimony that he "felt around" the gym bag and then, without more careful checking, opened it— after rummaging through the bin and searching several boxes—leads inescapably to the conclusion that he did not believe that the bag or the bin actually contained a *"live"* bomb.

▮ The mere existence of a weapon, without evidence of, or reasonable belief in, an imminent threat posed by the weapon, does not justify a warrantless intrusion under the exigency test. *See Martin, supra,* 562 F.2d at 673; *Ramapuram, supra,* 632 F.2d at 1152–53; *Shakur, supra,* 560 F.Supp. 361, 364 (S.D.N.Y.1983). The Court, for the aforementioned reasons, holds that no exigency existed in the instant matter. Therefore, the fruits of search of the defendant's storage bin must be suppressed.

12. The Court holds that King's statements regarding batteries are irrelevant, for neither Fragoso nor Shamel were ever told of these batteries.

*The Statements Taken from the Defendant*

■ Atkinson was detained by the Security Police on the island on July 15, 1986. Atkinson argues that the sole basis for his detention was the fruits of the illegal search on the previous day. It is undisputed that on July 16, 1986, inculpatory statements were made by Atkinson during his detention.

The post-arrest statements must be suppressed because they are fruits of an arrest that are thus "fruits of the poisonous tree." The Fourth Amendment taint which resulted in the taking of these statements is not attenuated, *c.f., Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), nor would these statements have been obtained through an "independent source" *c.f., Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), nor would they have been "inevitably discovered", *c.f., United States v. Villarreal,* 565 F.2d 932 (5th Cir.) (dissenting opinion), *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

### CONCLUSION

For the reasons set forth above, defendant's motion requesting the suppression of physical evidence seized from the Sacketts' storage bin is granted. The Court also grants defendant's motion suppressing post-arrest statements made by the defendant on July 16, 1986.

SO ORDERED.